**R. W. BASS et ux., Appellants,**

v.

**GENERAL MOTORS CORPORATION et al., Appellees.**

No. 691.

Court of Civil Appeals of Texas, Corpus Christi.

Feb. 28, 1973.

Rehearing Denied March 22, 1973.

Holder & Germany, C. Wayne Holder, Freeport, for appellants.

Butler, Binion, Rice, Cook & Knapp, John L. McConn, Jr., Vinson, Elkins, Searls & Smith, Jeff Crane, Jr., G. P. Hardy III, Houston, for appellees.

## OPINION

NYE, Chief Justice.

R. W. Bass and wife Velta Bass brought a products liability type case against General Motors Corporation and Cochran Motor Company. They alleged that defendant General Motors manufactured a car which was sold by defendant Cochran Motor Company to the plaintiffs in a defective condition which caused an accident with resulting personal injuries to Mrs. Bass. At the conclusion of the evidence the trial court withdrew the case from the jury and rendered judgment for the defendants. The court entered judgment that the plaintiffs take nothing, from which judgment they have prosecuted their appeal.

The sole question before us is whether the trial court erred in instructing a verdict for the defendants. Specifically appellants' four points of error are directed to the trial court's instruction of a verdict when appellants contend there was sufficient evidence which required the trial court to submit issues to the jury on the theory of (1) strict liability in tort; (2) implied warranty of fitness; (3) common law negligence based on the defendants' failure to inspect the automobile in question; and (4) misrepresentation of material facts concerning the character and quality of the subject vehicle. These points raise law questions. A proper determination of these questions must hinge on an acceptance of the evidence and the inferences therefrom in their aspects most favorable to the plaintiffs' case and in discarding all contrary evidence and inferences. Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W.2d 60 (1953).

An issue of fact may be raised by circumstantial evidence. But where such evidence is relied upon, the testimony must establish circumstances which are relied upon to support the inferences drawn. If the evidence merely shows enough to satisfy an inference that the circumstances may have existed, from which by a further process of logic it is sought to draw a second inference as to the truth of a basic fact proposition, the connection is too attenuated to raise a jury issue. 3 McDonald, Texas Civ.Prac., § 11.28.3 (1970); McCormick & Ray, § 1481.

The plaintiffs purchased a new 1966 Buick LeSabre automobile from the Cochran Motor Company in June 1966. The automobile had been manufactured by General Motors Corporation. It had been made ready for delivery and sold by Cochran Motor Company to the plaintiffs. In the two months that the plaintiffs had owned the vehicle before the accident, they had driven it a little over four thousand miles without any problems. On August 25, 1966, Mrs. Bass was driving the automobile in Clute, Texas. She testified that she turned into a private driveway off Railroad Street and brought the automobile to a complete stop. Mrs. Bass then shifted the automatic transmission of the automobile into reverse and slightly depressed the accelerator pedal. She was then asked:

"Q What occurred, if anything, then?

A   I put my foot—as everybody does to back it out—on the accelerator just slightly to back up.

Q   What happened?

A   I knew this was a narrow street, and this car just shot, threw me back and shot backwards, and my daughter in the back seat hollered, 'Mother, Mother,' and she scared me so bad that I immediately put it in drive and it shot forward.

Q   What, if anything, did you hit?

A   I hit the telephone pole, I presume it was the telephone pole.

.    .    .    .    .    .

Q   And then what happened, if anything?

A   Well, I immediately put it in drive and it shot forward, and I was at a slight angle, and hit the light post, I guess it was the light post because the light company come out there."

Mrs. Bass testified that she was unable to stop the car by using the brakes. She testified that she had driven the automobile on many occasions preceding the accident in both forward and reverse gears and that the automobile had operated in a normal manner. Mr. Bass testified that he had had no problems with the automobile nor had he noticed anything unusual about it prior to the accident.

Following the accident Mr. Bass had the automobile taken to Clyde V. Lee Motor Company in Freeport, Texas, for repairs to the body. Mr. Ruble Blagraves, the shop foreman, was requested to try and find out what caused the extreme acceleration in the automobile. Mr. Blagraves testified that checks were made of the car. The only problem that he could find in the throttle linkage or carburetor was a small screw that was loose on the butterfly, which he tightened with the screwdriver. Blagraves went on to testify that to his knowledge there was only one malfunction in any automobile which could cause an ac-

celerator to open by itself if the accelerator were not fully depressed. This malfunction, according to Blagraves, would be a broken left hand motor support. This would cause the engine to rise upon depression of the accelerator and force the accelerator wide open. He testified that he checked and this condition did not exist in appellants' automobile. Blagraves testified that if the throttle linkage in the automobile had become stuck, the carburetor would remain open at that particular setting. However, the acceleration of the automobile at that point would only be at the level of acceleration corresponding to the amount the accelerator pedal had been engaged. Mrs. Bass testified that she only depressed the accelerator pedal slightly. The personnel at Clyde V. Lee Motor Company found no evidence that the throttle linkage had stuck. The appellants have not attempted in any way to show that the cause of the occurrence in question was the slightly loose screw on the butterfly valve in the carburetor.

After the vehicle had been repaired by Clyde V. Lee Motor Company Mr. and Mrs. Bass each experienced an acceleration of the car. Mrs. Bass was asked specifically about the occurrence.

"Q   Could you tell the Court and Jury where and approximately when, if you know, this occurred?

A   No, I don't remember.

Q   You don't remember?

A   I don't remember when or where.

Q   Well, could you tell them you were driving forward or backwards, or how?

A   Forward.

Q   And what occurred, if anything?

A   Just the motor revved up, and that is when I cut it off and got out."

Mr. Bass was also asked the same question:

"Q   Describe that incident to this Court and the Jury.

A   I was backing out of the garage, or attempting to, and the car highly accelerated going backwards.

Q   What did you do?

A   I immediately cut the key off, the ignition off, and braked to stop the car.

Q   Did you do this in a fast and speedy manner?

A   Yes, sir, I am sure I did."

Following these incidents the automobile was taken back to Cochran Motor Company and examined for any condition which might have caused the alleged sudden acceleration on the date of the accident and afterwards.

Mr. Cochran, of the Cochran Motor Company, told Mr. Bass to bring the car over to see if he could determine what had caused the acceleration. Plaintiff Bass was then asked:

"Q   And what did he (Mr. Cochran), do, if anything?

A   What was done in the garage I have no idea. I was assured nothing was found to be malfunction by Mr. Cochran himself. I didn't talk to his shop foreman, shop manager, Mr. Cochran and I talked about this outside, and I believe he even drove the car, or sat in it and accelerated the thing to see if it would hang, and I tried it several times myself and I couldn't get it to hang, and he assured me that there wasn't anything they could find that would possibly cause high acceleration."

Besides the inspection done by Clyde V. Lee Motor Company and the subsequent inspection by the Cochran Motor Company, appellants' automobile was examined by Rugeley Motor Company, a Buick dealer in Bay City on two occasions after the accident. The first time the automobile was checked by Rugeley no defects were found and no repairs were made. The automo-bile was returned to the appellants. The second time the automobile was inspected and checked out by Rugeley Motor Company was on December 23, 1966. This was done at the direction of Mr. Peterson, a representative of the Buick Motor Division, by Mr. Newsome, the Assistant Service Manager of Rugeley Motor Company and by Mr. Virgil Smith, a line mechanic for Rugeley. At this time the automobile was checked and road tested by the Rugeley employees. Newsome personally inspected the accelerator linkage in the automobile and found nothing wrong. Some of the parts were replaced although nothing was found wrong with them. Mr. Newsome testified that this work was performed in order to satisfy the customer's complaints. Smith, the mechanic, removed the accelerator mechanism, completely disassembled the linkage and overhauled appellants' carburetor. Mr. Smith testified that he closely examined each part in the above mechanisms and could not find anything in appellants' automobile that was defective in any way. This work done by Rugeley Motors was done when appellants' car had approximately 7000 miles on the speedometer.

The appellants called as their expert witness Mr. Freddie Brown of Lake Jackson, Texas. Mr. Brown had an extensive background as an automobile mechanic. He was currently operating an independent garage. He testified that he had been an automobile mechanic for new car dealers and that he had on occasions worked on and repaired 1966 Buick automobiles. He was familiar with the throttle system of such vehicles. Mr. Brown testified that he had never seen the appellants' automobile and that his opinion was based on the hypothetical questions.

Mr. Brown testified that assuming the facts of the accident, the repairs (by Rugeley Motor Company) made some 3000 miles later, and the absence of further complaints after this work was performed, he assumed that this work must have corrected the problem. Summarizing Brown's

testimony in response to the hypothetical question he answered that: (a) If there were problems with the car at the time of the accident, and (b) if certain repairs were made to the car after the accident, and (c) if the problem disappeared after the repairs were made, then he would assume that the problem laid with the parts repaired and/or replaced. He was then asked his opinion based on reasonable mechanical probability for what length of time the defect, if any, had existed. He answered:

"A If a defect is evident at that mileage, or prior to this, and if the defect was in the carburetor or the electrical switch, it would be my opinion that this defect was there all the time, that it was built into the car, I mean if the mechanical problems did exist it would be my opinion the problem was there when the car was assembled."

On cross-examination Mr. Brown was asked what checks he would make if a customer was complaining of unexpected acceleration of his car. He answered:

"A I would check numerous things, I would start with the throttle shaft in the carburetor and I would check the closing fast idle cam mechanism, which is a part of the carburetor, I would check the engine mounts. A car has a little age on it, broken motor mount, bolts out of the motor mount, that would cause the engine to rise up on acceleration and develop a fast idle condition, and this is very common. I would check the throttle linkage from the carburetor to the firewall. I would check the return spring on the linkage to make sure the spring was effective, hadn't lost its effectiveness or be incorrectly screwed or fitted to the linkage, I would check the mechanism where it goes through the firewall, or cowl, I would check the accelerator pedal itself for a binding condition. If a car came to me and a customer complained of this, this is the method I would use to check and determine what the problem would be."

Brown further testified as to other possible causes concerning a throttle linkage hangup. He described a wrinkled rug inside the car that could cause the accelerator to engage. He admitted that any malfunction in the electrical circuits of the detent switch would simply cause a failure in the transmission insofar as its downshifting was concerned. He did testify that the detent switch could have an effect on the butterfly opening, but that the switch would not pull the butterfly open; that this switch is moved by means of a mechanical attachment to the butterfly and the carburetor, but should the switch bind, it could hold the butterfly open at that position. Brown agreed that for the detent switch to hang at some particular point someone would have to have pushed it to that point by use of the accelerator pedal.

Each of the possible causes enumerated by witness Brown were positively eliminated by actual checks of the car in question made by other witnesses. Mr. Brown did not at any time examine the car in question or any of its parts. He could not point to any specific defect which might have existed in the Bass automobile which could have caused the sudden acceleration.

The appellees contend that based on the speculativeness of Brown's testimony, coupled with the evidence obtained from all of the mechanics who actually worked on the car, the plaintiffs have failed to produce any evidence of a probative nature that there was in fact a defect in the automobile when it left General Motors or Cochran Motor Company's possession and control. We agree.

The Supreme Court of Texas in McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787 (Tex.Sup.1967) committed itself to the rule of strict liability expressed in Section

402A of the Restatement of Law of Torts. It states:

"(1) One who sells any product in a *defective condition* unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller." (emphasis supplied)

■ The prime requirement for imposing strict liability on a manufacturer is proof by the plaintiff that his injuries were a result of a defective condition in the product when it left the hands of the particular manufacturer or seller. Jack Roach-Bissonnet, Inc. v. Puskar, 417 S.W.2d 262 (Tex.Sup.1967).

The plaintiffs suggest that there are at least three cases that are parallel to the instant fact situation. In Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960) the only evidence of a defect in an automobile that swerved off the road and crashed into a brick wall was the testimony of the plaintiff. It was impossible to determine after the accident whether any of the parts of the steering wheel mechanism had been defective. Expert witnesses advanced the opinion based upon the history and examination that something definitely went wrong somewhere from the steering wheel down to the front wheels and that the accident must have been due to a mechanical defect or failure. The New Jersey Supreme Court held that this testimony plus the testimony of plaintiff herself was enough to raise a fact issue for jury determination.

The case before us can be distinguished from the Henningsen case in that the specific parts of the automobile allegedly defective were completely intact and examined by numerous mechanics who found nothing wrong. Plaintiffs' expert witness was unable to testify as to the existence of any defect that could have caused the complained of acceleration that had not already been ruled out by inspection.

In Vandermark v. Ford Motor Company, 61 Cal.2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964) the plaintiff alleged that the car brakes "applied themselves" due to a defect in the master cylinder system. Damages to this part of the automobile in the accident made it impossible for the plaintiff to point to a specific defect. In the case at bar no such impossibility of proof existed as none of the parts were damaged. In the California case plaintiff's expert witnesses were able to point to certain defects which, if present, could have caused the exact type of accident alleged by plaintiff. In this case before us appellants' expert witness was unable to point to any specific defects shown to have existed in the Bass automobile which could have possibly caused the sudden acceleration.

Appellants cite Sharp v. Chrysler Corporation, 432 S.W.2d 131 (Tex.Civ.App.—Houston (14th Dist.) 1968, n. r. e.). There the issue was not whether a defect existed at all, but rather the cause of the defect. In the Sharp case the defendants pleaded that an earlier collision was the intervening cause which destroyed the liability of the manufacturer. The issue was whether the defect could be traced back to the manufacturer, not whether a defect in fact existed.

■ The burden of proof that the product was in a defective condition when it

left the lands of the manufacturer or seller was upon the plaintiffs. Unless evidence can be produced that will support the conclusion that a specific part was defective, the burden is not sustained.

It is fundamental that in order to recover in a cause of action based upon strict liability or negligence, more than the accident itself must be proved. Buchanan v. Rose, 138 Tex. 390, 159 S.W.2d 109 (1942). Here the plaintiffs have simply proven that there was an accident. They have failed to show evidence above the quality of a scintilla that would entitle them to go to the jury on any of the theories advanced by them. The trial court was correct in instructing a verdict against the plaintiffs. Appellants' points of error are overruled.

Judgment of the trial court is affirmed.