**T–L DRILLING COMPANY, Appellant,**

v.

**NORTHERN PROPANE GAS COMPANY, Appellee.**

**No. 900.**

Court of Civil Appeals of Texas, Corpus Christi.

Nov. 27, 1974.

———◆———

Joseph P. Kelly, Guittard & Henderson, Victoria, Samuel J. Ferro, Jr., Spafford, Gay & Whitman, Dallas, for appellant.

R. D. Cullen, Victoria, for appellee.

## OPINION

NYE, Chief Justice.

This is a damage suit brought by T–L Drilling Company against Northern Propane Gas Company caused by an explosion of a propane gas tank which had caught fire and damaged some drilling equipment. The trial was to a jury. Before the jury retired, the court upon proper motion instructed a verdict in favor of the defendant gas company. Whereupon the plaintiff drilling company has perfected its appeal to this Court.

The facts are virtually undisputed. The drilling company was engaged in drilling oil wells for various oil companies. It owned the drilling rig located at the site known as Rosenquest, Number 1, north of Victoria, Texas. The gas company was in the business of selling and delivering propane gas to different drilling sites among which was the one owned by the drilling company.

The drilling company's rig, commonly referred to as a "utility unit", was approximately forty-two (42) feet by ten (10) feet in size. The floor of the rig was made of three-eighths (⅜) inch steel plate set on twin I-beams. The walls, made of three-eighths (⅜) inch steel, were welded to the floor and were airtight except for an opening approximately eight inches between the top of the wall and the roof. The unit was divided into four rooms. The electric control panel, breaker switches and the generators were located at the front end. The next room was a locker room. In this room, there was a shower stall, electric washer and dryer and a gas hot water heater. The next room contained spare parts and tools. The back end of the unit was open. This area contained two fifteen (15) horsepower water pumps, a twenty-five (25) horsepower compressor and a one thousand (1,000) gallon propane gas tank. The one thousand gallon tank was mounted on its own skid, which was in turn bolted to the utility unit. There was three or four inches of space between the bottom of the tank and the floor plate of the main unit. Mr. W. P. Larkin was the supervisor in charge of the drilling company's unit and was in charge on June 20, 1972, the date of the explosion. One of Mr. Larkin's duties was seeing that the unit was kept in proper working order.

On the morning of June 20, 1972, around 9:00 o'clock, the gas company's truck arrived at the drilling company's site with a load of propane. Mr. Jack Gaylord was the gas company's employee, employed to deliver propane to various rigs. Larkin requested that Gaylord fill up the one thousand gallon tank on the utility unit while he was there and put the balance of his load in the drilling company's six thousand (6,000) gallon tank. Larkin mentioned to Gaylord that the capacity gauge on the one thousand gallon tank was not operating. The gas company had filled the drilling company's one thousand gallon

tank on several occasions prior to June 20, 1972, and had serviced the drilling company generally since 1963. Gaylord began filling the one thousand gallon tank around 9:00 o'clock that morning. At that time, the tank was already approximately half full according to Larkin. Larkin later noticed that Gaylord was draining some of the propane off because Gaylord had overfilled it. Larkin also noticed that the delivery gauge on the gas company's truck registered four hundred twenty (420) gallons after filling the one thousand gallon tank. This meant that the total amount of propane placed in the one thousand gallon tank was approximately nine hundred twenty (920) gallons. Gaylord put the balance of his load in the large six thousand (6,000) gallon tank and left the drill site around 10:00 o'clock a. m. Approximately three hours later at 1:00 o'clock p. m., Larkin heard an explosion. He looked out his trailer door and saw that the whole open end of the utility unit was on fire. The one thousand gallon tank was located in this area. Approximately seven or eight minutes later, the one thousand gallon tank exploded, adding to the extensive damages to the unit alleged to be $37,814.86.

The sole question before us is whether the trial court erred in instructing a verdict for the defendant gas company. Specifically, the drilling company's two points of error are directed to the trial court's instruction of a verdict while the drilling company contends that there was sufficient evidence which would require the trial court to submit special issues to the jury on the theories of negligence and proximate cause and on the doctrine of res ipsa loquitur.

Since this is an instructed verdict case, the court must review the evidence in its most favorable light in support of the drilling company's position. Anderson v. Moore, 448 S.W.2d 105 (Tex.Sup.1969); Seideneck v. Cal Bayreuther Associates, 451 S.W.2d 752 (Tex.Sup.1970); McKeth-

an v. McKethan, 477 S.W.2d 357 (Tex. Civ.App.—Corpus Christi 1972, writ ref'd n. r. e.); Bass v. General Motors Corporation, 491 S.W.2d 941 (Tex.Civ.App. —Corpus Christi 1973, writ ref'd n. r. e.). A proper determination of these law questions must be based on an acceptance of the evidence and the inferences therefrom most favorable to the plaintiffs' case, discarding contrary evidence and inferences. White v. White, 141 Tex. 328, 172 S.W. 2d 295 (1943); Triangle Motors of Dallas v. Richmond, 152 Tex. 354, 258 S.W. 2d 60 (1953).

In order for a plaintiff to recover for damages claimed to have been caused by the tortious conduct of a defendant, the plaintiff is only required to prove that an accident probably resulted from the negligence of the defendant. Renfro Drug Co. v. Lewis, 149 Tex. 507, 235 S.W.2d 609 (1951); Burlington-Rock Island R. Co. v. Ellison, 140 Tex. 353, 167 S.W.2d 723 (1943). Both negligence and proximate cause may be established and an issue of fact may be raised by circumstantial evidence. J. Weingarten, Inc. v. Brockman, 134 Tex. 451, 135 S.W.2d 698 (1940); Bock v. Fellman Dry Goods Co., 212 S.W. 635 (Tex.Com.App.1919). If the gas company owed a duty to the drilling company and if there is any evidence of a breach of that duty which proximately caused the resulting damages, then the gas company was not entitled to an instructed verdict.

Appellant drilling company's two points of error will be discussed conjunctively since the company is complaining that there was ample evidence of negligence on the part of the gas company and that there was ample evidence that such negligence was the proximate cause of the explosion and fire. It is the drilling company's theory that the cause of the fire or explosion was that excessive propane gas was put into the tank, causing it to build up a great amount of pressure which was too much for the safety relief valve on

the tank to properly handle, thus permitting gas to escape and ignite, causing the resulting fire and explosion. The only actual witness to the explosion and fire was Larkin.

Larkin testified that on the morning of June 20, 1972, somewhere around 9:00 o'clock, the gas company's truck arrived with a load of propane. He requested Gaylord, the gas company's employee, to fill the one thousand gallon tank first and then the six thousand gallon tank. He also told Gaylord that the capacity gauge was not working on the one thousand gallon tank. The one thousand gallon tank was approximately half full to begin with. Larkin did not watch Gaylord continuously, but stayed in the general vicinity. When Larkin returned, Gaylord was draining off some of the propane. Gaylord admitted to Larkin that he had filled the tank too full and had to drain some off. Larkin testified that Gaylord did not drain off very much propane gas. There was evidence that the tank contained an excess of between 40 and 80 gallons of propane when Gaylord finished filling it. The drilling company's expert witness, Frank Weaver, testified that for safety reasons these tanks should not be filled beyond 84 to 88 per cent.

In response to a question of why it was a matter of safety, Weaver testified as follows:

"Q Will you explain that please?

A Yes. You are considering this your safety factor. You are allowing that extra volume to take up the expansion of the liquid. I said we could get the tank completely full and it would be all right. This is assuming we are not going to increase the temperature. If it is a cold night and the temperature decreases you are all right.

Q But if the temperature increases are you still then all right?

A No, *you are then in trouble.*

Q What do you mean by 'in trouble?'

A Then you can lose propane out, or depending on how fast the liquid is expanding, *you can rupture the vessel.*

Q Or ignite it if it comes in contact with an ignition point after it left the tank?

A Oh, yes. After it left the tank." (Emphasis supplied.)

Larkin also testified that when he saw Gayord drain the liquid out of the tank, he saw some of this liquid fall to the back side of the tank before it turned into vapor. Larkin stated this was the first time he had seen anyone drain a propane tank. The record discloses that the temperature on June 20, 1972, rose from 75 to 80 degrees at the time Gaylord filled the tank to 100 degrees or more at the time of the explosion. The evidence also showed that there was very little wind as it was "very still" that day. Larkin also testified that there was nothing around the utility unit that was combustible that he knew of, other than the propane gas in the tank.

Frank Weaver, the expert witness, testified that if the tank was filled beyond 88 per cent capacity, any increase in temperature would cause the gas to expand, causing the safety release valve to open, thereby releasing the propane into the atmosphere. Each gallon of propane liquid that was released would produce approximately 35 cubic feet of gas vapor. This gas vapor, being heavier than air, has the propensity to fall to the earth and remain in low lying areas for some time. Weaver testified that propane gas will move along the ground with the wind, provided the wind is not of high velocity and that the wind could carry the propane gas to an ignition point. This Court has taken judicial knowledge of the inherently explosive and dangerous nature of propane gas. See Smith v. Koenning, 398 S.W.2d 411 (Tex.Civ.App. —Corpus Christi 1965, writ ref'd n. r. e.).

■■ It is uncontroverted that the gas company employee overfilled the propane tank thereby breaching the duty owed to the owner drilling company. This breach of a duty was negligence. It is, therefore, readily apparent to us that there was ample evidence of negligence, both direct and circumstantial. It next becomes necessary to consider proximate cause. Proximate cause embraces at least two (2) distinct concepts, both of which must be present: 1) there must be cause in fact —a cause which produces an event without which an event would not have occurred; 2) foreseeability. Baumler v. Hazelwood, 162 Tex. 361, 347 S.W.2d 560 (1961); Kaufman v. Miller, 414 S.W.2d 164 (Tex. Sup.1967); Nickel v. Snider, 484 S.W.2d 940 (Tex.Civ.App.—Corpus Christi 1972, writ ref'd n. r. e.). Proximate cause may be established by circumstantial evidence. Thoreson v. Thompson, 431 S.W.2d 341 (Tex.Sup.1968); Lane v. Cloninger, 444 S.W.2d 199 (Tex.Civ.App.—Amarillo 1969, no writ); Head v. Coleman, 470 S.W.2d 380 (Tex.Civ.App.—Waco 1971, writ ref'd n. r. e.); 40 Tex.Jur.2d 693, Negligence, § 157.

■ Of these two elements we first consider the element of foreseeability. The foreseeability element of proximate cause is established by proof that the actor as a person of ordinary intelligence and prudence should have anticipated the danger to others created by his negligent act. The rule does not require that he anticipate just how the injury will grow out of that dangerous situation. Enloe v. Barfield, 422 S.W.2d 905 (Tex.Sup.1967); Biggers v. Continental Bus System, 157 Tex. 351, 298 S.W.2d 79, 303 S.W.2d 359 (1957); Clark v. Waggoner, 452 S.W.2d 437 (Tex. Sup.1970). It was reasonably foreseeable that the propane gas that was drained off immediately after the filling of the tank might settle around the tank and later ignite. It was also reasonably foreseeable that the temperature was going to rise during the day on June 20, 1972, and that excess propane gas already in the overfilled

tank would be forced out the safety release valve, settle around the unit, and be ignited from a spark from any one or more pieces of electrical or other equipment located on the rig. It is quite clear that a jury could reasonably have inferred that Gaylord should have anticipated and foreseen that some sort of damages would result from his negligent conduct, even though it was not essential that the particular injurious consequences and the precise manner of its infliction could reasonably have been foreseen. Western Hills Bowling Center, Inc. v. Hartford Fire Ins. Co., 412 F.2d 563 (Cir.Ct.App. 5th 1969). Therefore, the question is narrowed down to whether there is evidence of probative force that the overfilling of the 1,000 gallon propane tank was a cause in fact of the explosion and fire.

If the negligent conduct of the gas company's employee was a substantial factor in bringing about the damages and that "but for" such negligent act or acts the drilling company would not have suffered the damage, then there is a cause in fact. See Wichita City Lines v. Puckett, 156 Tex. 456, 295 S.W.2d 894 (1956).

■ In Mobil Pipe Line Company v. Goodwin, 492 S.W.2d 608 (Tex.Civ.App. —Houston [1st Dist.] 1972, writ ref'd n. r. e.), a similar situation existed to the case at bar. In that case escaping LPG exploded killing three workers. However, there was no direct evidence as to how the gas was ignited. The court discounted the need for plaintiffs to show that the gas was ignited in a particular way stating:

"The only evidence as to how the LPG was ignited is circumstantial. All of the persons working at the station were killed in the fire. The premises were owned and controlled by the defendant. *There was evidence of the existence of a number of devices that could have provided the spark to ignite the escaped LPG.* A spark may be produced by the stopping and starting of a compressor

motor on an air conditioner outside a building near the ditch where the contents of the 4-inch line were discharged, and there was evidence that in a building on the premises there was a telephone (that was not the explosion-proof type) and also a hot water heater with a gas pilot. There was testimony that LPG will spread if it gets into the atmosphere. It could spread to the building where the air conditioner's cutting on and off would be a hazard under these circumstances." (Emphasis added.)

Here, Larkin testified to the following equipment being on the utility unit, each of which could have ignited the gas: two electric 15-horsepower water pumps; two electric 25-horsepower compressors; two 100/kw generators with gas engine; a gas dryer; and a gas water heater. Weaver stated that an electric motor could cause a spark that would ignite the propane gas. The drilling company is not required to show that the propane gas was ignited in a particular way. Under the evidence, it could have happened in any one of several ways. Broad latitude should be allowed jurors to infer proximate cause for the circumstances surrounding the explosion. Thoreson v. Thompson, supra.; J. Weingarten, Inc. v. Brockman, 134 Tex. 451, 135 S.W.2d 698 (1940); Mobil Pipe Line Company v. Goodwin, supra. Viewing then the evidence in the light most favorable to the drilling company, we hold that there was at least some evidence of probative force that the negligence on the part of the gas company was the proximate cause of the explosion and fire. Appellant's points of error 1 and 2 are sustained.

 Appellant, although not complaining specifically in a point of error, asserts in their brief that an alternative theory of recovery exists in res ipsa loquitur. Under this doctrine, negligence may be inferred from the mere fact that an accident happened, provided the charac- ter of the accident and the circumstances in proof attending it may be such as to lend reason to the belief, that without negligence, it would not have occurred. Smith v. Koenning, supra; Owen v. Brown, 447 S.W.2d 883 (Tex.Sup.1969). In order to invoke the rule which involves this doctrine, the instrumentality, which caused the injury or damage complained of, must be under the exclusive management or control of the defendant; the reasonable evidence shows that the accident arose from a want of care in the absence of an explanation; and the accident must be such as in the ordinary course of things it does not happen if those who have the management or control of it use proper care. See Owen v. Brown, supra; Bond v. Otis Elevator Company, 388 S.W.2d 681 (Tex.Sup.1965).

 The control that is required for the application of the doctrine of res ipsa loquitur is not necessarily the control exercised at the time of the injury, but it may be the control exercised at the time of the negligent act which subsequently leads to the injuries. Prosser, Torts, 219 et seq. Fourth Edition 1971. Here the evidence showed that the drilling company owned the tank and it was attached to their drilling rig. Several times a week, the gas company would service these tanks by filling them up. The record shows that the gas company employee was in control of the tank for a time. The record is not clear as to what took place after the tank had been filled. It is not necessary, in view of our disposition of this case, to determine from the evidence before us whether the doctrine is applicable. However, upon a retrial and after all the evidence is in, the rules which we have set forth above will be determinative.

The judgment of the trial court is reversed and the cause is remanded to the trial court.

Reversed and remanded.