98-00826 Ford Motor Company v Gonzalez.wpd



No. 04-98-00826-CV

FORD MOTOR COMPANY,

Appellant

v.

Robert GONZALEZ, Jr. and Nora NAVIN,

Appellees

From the 79th Judicial District Court, Jim Wells County, Texas

Trial Court No. 93-04-31598

Honorable Terry A. Canales, Judge Presiding

Opinion by: Alma L. López, Justice

Sitting: Phil Hardberger, Chief Justice

 Tom Rickhoff, Justice

 Alma L. López, Justice

Delivered and Filed: October 20, 1999

AFFIRMED

 This is a products liability case stemming from a single car accident in Jim Wells County.
Ford Motor challenges the legal and factual sufficiency of the evidence of causation supporting a jury
verdict in favor of plaintiffs' claims of manufacturing defect, marketing defect, negligence, and
deceptive trade practices concerning a 1989 Ford Escort. We find sufficient evidence of a causal link
and affirm the judgment of the trial court.

Factual Background

 Robert Gonzalez, Jr. purchased a new Ford Escort from the Ford dealership in Alice, Texas,
in 1989, and over the next several months noticed excessive wear on the outer part of the right front
tire. None of the other three tires on the vehicle exhibited unusual or uneven wear. Gonzalez returned
to the dealer to have the car's front end checked. On this first of many such attempts to address the
problem, Ford dealership mechanic, Frank Ruiz, checked the camber,(1) caster,(2) and toe-in(3)
measurements on the front-end wheel alignment and found a misalignment of the right front wheel.
Ruiz adjusted the alignment by turning the tie rod ends to adjust the toe-in. The adjustment held for
a time; however, when Gonzalez noticed that his right front tire was, again, showing uneven, outer-
edge wear, he returned to the dealership several more times. He ultimately discussed the problem
on four separate occasions with factory representatives and was reassured that "the problem would
be corrected."

 When the realignment did not hold, Ruiz next noted that the ball joint tie rod ends were worn
and loose.(4) He replaced them, reset the toe-in, and rotated the tires. When the uneven wear on the
right front tire reoccurred, Gonzalez took the car to Sears Automotive Center for another
realignment. The uneven wear problem continued. Gonzalez returned to the Ford dealership where
Ruiz again adjusted the toe-in. Gonzalez brought his Escort in for such service between ten and
fifteen times during the two years he owned the car. 

 Gonzalez used this car to drive to and from his work as a derrick hand for Blocker Drilling.
On April 15, 1991, he had completed a 12-hour shift at a drilling site near Pearsall and slept for
several hours before driving to his home in Alice, Texas. Traveling with him were his fiancé,
plaintiff Nora Navin, and her son, Jordan. They were all wearing seatbelts. As they neared Alice,
Gonzalez and Navin were conversing in the front seat, and Jordan was eating a snack in the back
seat. Driving southward on Highway 281 at approximately 58 miles per hour,(5) Gonzalez testified that
the steering wheel suddenly jerked violently in his hands, the Escort swerved to the right, onto the
shoulder, then as he steered back onto the pavement, it rolled over five times.(6)

 The accident was witnessed by Sam Rodriguez, who was driving in the opposite direction
in the northbound lane. Rodriguez noticed the Escort approaching in a normal manner, then the right
front wheel wobbled and leaned to the right. The left front tire was straight, but the right front tire
was leaning in the two o'clock position. He could see Gonzalez fight with the steering wheel as the
car approached the shoulder. When the car returned to the pavement, it rolled over. Rodriguez
reported to the investigating officer, Trooper Caro, that a visible problem with the right front wheel
occurred before Gonzalez lost control of the Escort. The trooper testified that Rodriguez's eye-witness account was consistent with his investigation of the tire tracks, gouge marks, and other
evidence at the crash site. Appellees' expert, James Flanagan, M.E., agreed. Trooper Caro also
testified that the tire marks on the roadway left by the right tires indicated to him that these tires were
"at least upright enough" to be leaving tire marks. He thought they might be "yaw marks," indicating
that the right front wheel was sliding sideways but still spinning when the car returned to the
pavement after going off the shoulder, but he wasn't sure.

 The Escort was unavailable for inspection by either party. The jury viewed photographs of
the right front wheel and the suspension assembly taken after the accident which show that the right
front MacPherson strut(7) was disconnected from the wheel assembly. 

 Ford's mechanical engineering expert, Frederick Dahnke, stated that the repairs performed
by the dealership were appropriate responses to the complaints Gonzalez brought and that in his
opinion the repairs had corrected the problem each time. He also stated that he would expect the
right front tire to show wear first because it receives the power of acceleration first. Another
contributing factor to right front tire wear is the fact that the passenger seat is often unoccupied,
causing the wheel with the lighter load to want to spin faster. The right front tire at the time of the
accident did not show unusual wear; however, Gonzalez testified that he had to frequently rotate and
replace his tires because of the misalignment problem. He also stated that he would not have
purchased the car had he been told to expect right front tire wear to this degree.

 Ford's accident reconstructionist, Dr. Martinez, testified that the cause of the accident
actually lay with Gonzalez. Calculating that Gonzalez was traveling approximately 70 miles per
hour, he made a sharp steer to the right causing the Escort to go off the road, and then a sharp left
steer to get back on the pavement which ultimately sent him into the roll.

 The jury found Ford Motor Company liable for manufacturing defect, marketing defect,
negligence, and violations of the DTPA. Comparative negligence findings were assessed at 80%
liability to Ford Motor and 20% against Gonzalez. Based on this verdict, the trial court entered
judgment in favor of Navin for $249,000.00 and in favor of Gonzalez for $361,400 plus pre- and
post judgment interest. This appeal followed.

Legal Sufficiency


 Ford Motor's first issue complains there is no evidence that any defect in the Ford Escort or
that Ford Motor, itself, caused the plaintiffs' accident. To review a no-evidence challenge to the
verdict, we must consider all of the record evidence in the light most favorable to the party in whose
favor the verdict has been rendered, and indulge every reasonable inference deducible from the
evidence in that party's favor. See Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors,
Inc., 960 S.W.2d 41, 48 (Tex. 1998); Associated Indem. Corp. v. CAT Contracting, Inc., 964 S.W.2d
276, 285-86 (Tex. 1998). Under this standard our scope of review extends to all the evidence. Id.
Where there is any evidence of probative force to support the finding, we must overrule the challenge
and uphold the finding. ACS Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430 (Tex. 1997).

 Ford Motor asserts that the pivotal issue is whether the right front wheel disconnected as a
result of the accident, or whether it occurred before and caused the accident. Ford Motor argues that
the jury, having heard evidence of abnormal tire wear, drew an unsupported causal connection
between tire wear and the strut coming out of the steering knuckle. Ford Motor asserts that there is
no evidence that anything was wrong with the tire alignment or suspension camber or caster. To
make this argument, however, Ford Motor ignores testimony supplied by the appellees' witnesses.
While the jury did hear testimony that when the Escort returned to the pavement after veering on the
shoulder, its right tires were still upright, it also heard Rodriguez state that the right front tire was
leaning in the two o'clock position before the car left the pavement the first time. They also heard
Trooper Caro opine that the tire marks made once the car returned to the pavement, although
"upright," were in a sliding, spinning or yaw pattern. Flanagan testified that the relatively undamaged
condition of the strut proved that the wheel came loose before the crash. Had the wheel torn off
during the crash, as Ford suggests, he would have expected to see more damage to the strut.

 The thrust of Ford Motor's argument is that appellees' expert witnesses did not offer
sufficient explanation of the mechanical relation between the strut and wheel alignment, camber and
caster, and off-road tire marks to support a causal connection between misalignment and the
resulting accident. Ford claims that the only evidence of this relation is Flanagan's "bare" expert
opinion that "the wheel came off, came loose from the strut." Ford points out that Rodriguez, the
eyewitness, offered no testimony as to why the wheel came loose, only that it leaned prior to the
accident. Gonzalez and Navin testified about what they experienced inside the car. Only Flanagan
attempts to link their testimony to a defect, and Ford attacks this effort as "totally deficient."

 Naked expert opinion unsupported by fact can be said to have a "suspension problem" of its
own because it carries no probative force in law. See Bass v. General Motors Corp., 491 S.W.2d
941, 945 (Tex. Civ. App.-Corpus Christi 1973, writ ref'd n.r.e.). However, as our sister court in
Texarkana has noted, direct proof of a defect is not required.

 Strict liability does not require a specific showing of how the product became
defective. McDevitt v. Standard Oil Co., 391 F.2d 364 (5th Cir.1968). In a classic
case in which a consumer found a putrefied big toe in a plug of chewing tobacco, the
consumer was not required to prove how the big toe got there or whose toe it was.
Pillars v. R.J. Reynolds Tobacco Co., 117 Miss. 490, 78 So. 365 (1918), cited in
Lartigue v. R.J. Reynolds Tobacco Co., 317 F.2d 19, 34 (5th Cir.1963). That is the
nature of products liability. This rule evolved because a consumer is not in a position
to know the manufacturing process and how the defect might have occurred. See
McDevitt, 391 F.2d 364. Thus, an ordinary product user is in no position to come
forward with evidence pinpointing the act of negligence responsible for the user's
injuries. See id. The consumer ordinarily is ignorant of both the product's intricacies
and its maker's activity. See David P. Griffith, Products Liability--Negligence
Presumed: An Evolution, 67 Tex. L. Rev. 851, 875 (1989). The rule that a consumer
does not have to show specifically how a product became defective is also based on
a consumer's right to receive a safe product from the manufacturer. One who sells a
defective product is subject to liability for physical harm caused to the ultimate user,
even if the seller exercised all possible care in the product's preparation or sale.
Gonzales, 571 S.W.2d 867. Courts presume a breach of a duty of due care as would
be required in a negligence case; therefore, the injured party does not have to prove
a breach. Plas-Tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 444 (Tex.1989).


 If the plaintiff has no evidence of a specific design defect or manufacturing
defect, he may offer evidence of the product's malfunction as circumstantial proof of
the defect. General Motors Corp. v. Hopkins, 548 S.W.2d 344, 349-50 (Tex.1977).
The testimony of a product's user or operator about the circumstances of the event
complained of has been held sufficient to establish the product's alleged malfunction.
See Wernimont v. International Harvester Corp., 309 N.W.2d 137 (Iowa. Ct.
App.1981); Garrett v. Nobles, 102 Idaho 369, 630 P.2d 656 (1981). 


Sipes v. General Motors Corp., 946 S.W.2d 143, 155 (Tex. App.-Texarkana 1997, writ denied).

 In this case, there was no opportunity for experts to pour over the wrecked car before
testifying. Flanagan, instead had to piece together for the jury the evidence that something was wrong
with the car from the beginning.(8) Flanagan testified that the recurring problem of uneven wear on
the outer edge of the Escort's right front tire was caused by a misalignment of the camber and castor,
not by a misalignment of the toe-in. Both he and Ruiz testified that the Ford Escort's front-end
suspension is designed so that the camber and castor are built-in at the factory - dealership
readjustment is not intended. 

 Flanagan stated that the misalignment of camber and caster caused vibration in the ball joints
which are bolted to the steering knuckle arm. He opined that this vibration from the factory-set
misalignment damaged the ball joint by hammering the socket and ball. Such damage loosens the
ball joint to the point that the wheel can be wobbled back and forth. He stated that this damage began
when the Escort left the Ford factory and continued with the replacements until the day of the
accident.(9) He further testified that when the Escort was returned to the dealership several times with
alignment problems, the factory representative should have acknowledged that there was a problem
with the suspension system, replaced the front end, and that would have prevented the accident. 

 Ford also argues that there is no evidence to support an inference that tire alignment or tire
wear caused the right front MacPherson strut to pull free from the steering knuckle. The only
evidence offered, says Ford, is that Gonzalez testified he met with Ford factory representatives at
least four times, and they assured him the problem would be corrected. Ruiz testified he did realign
the wheels each time. Ford says this does not prove that alignment caused the strut to separate from
the knuckle, therefore it does not prove a defect caused the accident. Unusual tire wear, however,
was not touted as the cause of the accident, rather it evidenced a chronic symptom from which the
jury could infer a defective suspension system. 

 Ford further argues that there is no evidence of proximate cause on the marketing defect and
DTPA claims. Gonzalez testified he was never told that the right front tire was the dominant tire in
the Escort and that it would wear faster that the other three, and that he would not have purchased
the car had he known. Ford Motor asserts that this is insufficient to link excessive tire wear to the
strut-knuckle separation. It is only relevant to a claim for new tires. The appellees submitted to the
jury several independent theories of liability, i.e., manufacturing defect, marketing defect,
negligence, and three different definitions of deceptive conduct under their DTPA claim. If any one
of these theories is supported by the evidence, the judgment may be affirmed. Cf. Webb v. Lawson-Avila Constr., Inc., 911 S.W.2d 457, 462 (Tex. App.-San Antonio 1995, writ dism'd). On the basis
of the evidence outlined in this opinion, we find that the jury heard sufficient evidence to reach its
decision on liability on any one of these four theories of liability.

Factual Sufficiency


 Ford Motor claims that the evidence supporting the jury's findings of liability are so factually
weak as to be clearly wrong. It asserts that the evidence can only support one conclusion: that the
right front MacPherson strut broke free from the steering knuckle during and as a result of the roll
of the vehicle, and not before the accident. The company bases this conclusion on its own two
experts who testified that the physical evidence did not support plaintiffs' theory. Ford discounts
Rodriguez's eyewitness account of the tire leaning in the two o'clock position as only seeming to
be so. This argument does nothing more than attack the credibility determinations that the jury made.
The jury, however, could reasonably conclude that if Gonzalez experienced recurring problems with
the right front tire and Rodriguez saw the right front wheel lean or bend in the two o'clock position
before the Escort went off the pavement, that the separation between strut and knuckle occurred
before the accident and caused the accident. The conflicting expert testimony was subject to a
credibility call which the jury made.

 Ford Motor Company's issues are overruled and the judgment of the trial court is affirmed.


 Justice Alma L. López 

PUBLISH


1. Camber is the inward or outward tilt of the wheel at the top as viewed from the front of the vehicle. Inward tilt
is referred to as negative camber, outward tilt is referred to as positive camber. These settings are permanently set at the
factory.
2. Caster is the forward or rearward tilt of the support arm of the wheel as viewed from the side of the vehicle.
These settings are permanently set at the factory.
3. Toe is the comparison of horizontal lines through both wheels of the same axle as viewed from above the axle.
Toe-in refers to the wheel setting that is directed "in" or toward the engine, toe-out describes a setting directed "out" or
away from the engine.
4. Ruiz testified that this wear is not unusual for a car approaching 20,000 miles and is generally the result of
driving on unpaved, bumpy roads. Plaintiff's mechanical engineering expert, Flanagan, however, stated that it was more
likely that one would not encounter this problem before 50,000 miles unless something was hammering on them as a
result of a misalignment.
5. Gonzalez maintains he was traveling at 58 miles an hour and was not in a hurry, and the only eyewitness, Sam
Rodriguez, confirms that he was not speeding. However, Ford's accident reconstruction expert, Dr. Jose Martinez,
calculated that the Escort was traveling approximately 70 miles per hour, based on calculations from tire marks and roll
marks.
6. Gonzalez and Navin suffered physical injuries which required surgery, and Gonzalez sustained permanent
weakness and numbness in his right arm. Ford does not dispute the damage awards.
7. The MacPherson strut is the mechanism that holds the front end of the vehicle up. It is connected to the wheel
assembly through the steering knuckle, and stands in a roughly vertical position bolted to the Escort's body.
8. Flanagan based his decision on a review of the photos, the 1989 and 1990 repair records from the dealership,
the eyewitness account, deposition testimony, and inspection of an exemplar vehicle.
9. Such opinions concerning maladjusted camber and defective ball joints have withstood no-evidence challenges
in other courts. See, e.g., Wylie v. Ford Motor Co., 536 F.2d 306, 307-09 (10th Cir. 1976) (reversing trial court's
exclusion of expert testimony that Ford's defective ball joint caused crash when front wheel fell out of socket); Moran
v. Ford Motor Co., 476 F.2d 289, 290-91 (8th Cir. 1973)(reversing directed verdict in light of expert opinion that
defective right front wheel ball joint separated and caused right front wheel to detach prior to crash); Ford Motor Co.
v. McDavid, 259 F.2d 261, 262 (4th Cir. 1958) ("wear on the right front tire ... [on] the outer edge ... indicates
maladjusted camber."); Gibbs v. General Motors Corp., 450 S.W.2d 827, 828-29 (Tex. 1970)(reversing summary
judgment in favor of car manufacturer where expert opined that ball joint came apart and caused front wheel to come
loose before crash).