Charles C. STONE, Jr., Appellant,

v.

**LAWYERS TITLE INSURANCE CORPORATION et al., Appellees.**

No. 998.

Court of Civil Appeals of Texas, Corpus Christi.

March 31, 1976.

Rehearing Denied May 20, 1976.

C. Edwin Prichard, Jr., Corpus Christi, for appellant.

James P. Ryan, Wood, Burney, Nesbitt & Ryan, John A. Waller, Lev Hunt, Kleberg, Mobley, Lockett & Weil, Corpus Christi, for appellee.

## OPINION

BISSETT, Justice.

The opinion rendered by this Court on December 31, 1975, is withdrawn and this opinion reaching the same result is substituted therefor.

This appeal involves actions in contract and in tort. The suit, as originally instituted, involved actions in contract, in tort, and in trespass to try title. Charles C. Stone, Jr. (Stone) sued: 1) Lawyers Title Insurance Corporation (Lawyers Title) on an owner's title policy covering an 18.639 acre tract of land which it had theretofore issued to him to recover damages which he allegedly sustained because of the failure to show certain pipeline easements as an exception in the title policy that was issued to him by it and to recover attorneys' fees incurred by him as a result of his bringing suit; 2) Isabel B. Weil (Goodstein), the seller of the subject land to him, for breach of warranty; 3) Lawyers Title Agency of Corpus Christi, Inc. (the Agency) and Eli Lipner (Lipner) its president, who countersigned the title policy, because of fraud and negligence in failing to show the pipeline easements as an exception in the owner's title policy, and in a mortgagee's title binder; 4) Joe B. Weil, Jr., (Weil), the real estate agent who negotiated the sale of the land to him, for fraud; and 5) Lo-Vaca Gathering Company (Lo-Vaca) in trespass to try title, to settle the issue as to the validity of the easements.

On January 12, 1973, Lo-Vaca was granted an interlocutory judgment that the plaintiff take nothing in his suit against it, which became final when final judgment was rendered. Trial before a jury as to the remaining defendants began on January 7, 1975. The plaintiff took a non-suit as to Goodstein after trial commenced, but before final judgment was rendered. After the plaintiff rested, the defendants declined to put on any evidence. The Agency, Lipner and Weil filed motions for instructed verdict, which were granted by the trial court. Judgment was rendered that the plaintiff take nothing on his tort actions against the Agency, Lipner and Weil, and that he recover $2,879.00 of and from Lawyers Title as damages under the terms of the title policy. The court costs were assessed ⅔rds to plaintiff and ⅓rd to Lawyers Title. Stone has appealed.

In early 1970, Stone contacted Weil about the purchase of part of a 70 acre tract in Nueces County, Texas, owned by Goodstein. Stone, who desired to construct a mobile home park thereon hired an engineering firm to plat an 18.639 acre tract out of the southeast corner of the 70 acre tract. A strip of land 25 feet wide out of the 70 acre tract, adjacent to and south of the south line of the 18.639 acre tract, was deliberately excluded from the land desired by Stone because of the known several oil and gas pipelines in the strip.

The 18.639 acre tract was conveyed to Stone by general warranty deed, dated March 11, 1971, for a cash consideration of $55,917.00. No exceptions or reservations appear in the deed. Also, on March 12, 1971, Lawyers Title issued an owner's title policy to Stone which insured the title to the land so purchased in the amount of $55,917.00. The premium was paid by Goodstein. The policy made no mention of any outstanding pipeline easements.

In order to obtain the money ($370,000.00) necessary to finance the project, it was necessary for Stone to first secure a $397,000.00 commitment from the Federal Housing Administration (FHA) that it would insure a loan upon completion of the project. The commitment, which was duly issued, was based upon the construction of a mobile home park containing 147 spaces. In June of 1971, when the mobile home park was approximately 80% complete, a live, high pressure gas pipeline was discovered approximately 4 feet inside the south-

ern boundary of the 18.639 acre tract. Later, several other such pipelines were discovered inside the southern boundary of the tract. It was then learned that the pipelines were in easements in a strip of land approximately 25 feet in width north of the south line of the 18.639 acre tract. The strip constituted something less than an acre in area, and comprised about 5½% of the total area of the entire tract.

Due to certain regulations of the FHA concerning the proximity of residential structures to live pipelines, the discovery of the pipelines within the boundary of the 18.639 acre tract forced Stone to redesign the layout of the park. The new configuration of the park contained only 129 spaces. This reduction in the number of spaces caused the FHA to scale its commitment downward to $318,500.00.

Shortly after the pipelines were discovered, Stone notified Mr. Charles Bonniwell, his attorney, who, he said, "started legal proceedings rolling on contacting Lipner and Lawyers Title, Inc. (Lawyers Title Agency)". Suit was instituted on January 12, 1972.

The effect of the interlocutory judgment in favor of Lo-Vaca was to judicially establish that the pipeline easements, on which were located the pipelines in question, were valid easements which were in full force and effect at and prior to the date of Stone's deed to the 18.639 acre tract. There is no appeal from the judgment in favor of Lo-Vaca.

## THE ACTION AGAINST LAWYERS TITLE

The trial court, prior to the commencement of trial, granted Lawyers Title's motion in limine which prevented Stone from producing any evidence, or asking any questions concerning the cost of removal of the pipelines. The court also sustained Lawyers Title's special exceptions to Stone's pleadings, which resulted in the elimination of Stone's cause of action against Lawyers Title recovery of attorney's fees. During the trial, the court granted Lawyers Title's motion to strike Stone's testimony concerning the value of the 18.639 acre tract as burdened with the pipeline easements; refused to admit testimony offered by Stone's appraiser concerning the value of the land as burdened with the easement and its value without the easement; would not permit the introduction of any evidence concerning the amount of reduction of the FHA commitment; and refused to admit any evidence relating to attorney's fees incurred by Stone in this litigation.

Title insurance is a contract of indemnity. Its purpose is to indemnify the insured for the failure of the title so guaranteed. The title policy which was sued on by Stone, in the event of an outstanding interest that was adverse to the indefeasible title guaranteed thereby, provided:

" . . . then the liability of the Company shall be only such part of the whole liability limited above as shall bear the same ratio to the whole liability that the adverse interest, claim, or right established may bear to the whole estate or interest in the land, such ratio to be based on respective values determinable as of the date of this policy. . . ."

The Texas Supreme Court, in *Southern Title Guaranty Co., Inc. v. Prendergast*, 494 S.W.2d 154 (Tex.Sup.1973), speaking through Mr. Justice Reavley, in clarifying the meaning of the above-quoted provision of an owner's policy of title insurance, said:

"If the amount of the policy is the same as the value of what is insured, . . . the recoverable loss is the value of the outstanding interest. . . ."

That announcement controls the disposition of Stone's suit against Lawyers Title for recovery of damages under the policy. Here, the amount of the policy, and the value of the entire 18.639 acre tract at all times pertinent to this appeal is the same, $55,917.00.

In his fifth amended petition, his trial petition, Stone alleged that on March 12, 1971, the market value of the 18.639 acre tract was $55,917.00; that on that same date the value of the outstanding interests (the Lo-Vaca pipeline easements) was $23,-000.00; and that he has been damaged by

and is entitled to recover from Lawyers Title the sum of $23,000.00 under the terms of his owner's title policy.

Lawyers Title's original answer, filed on February 11, 1972, consisted of a general denial. Its fourth amended original answer, filed with the trial judge on January 6, 1975, in addition to certain admissions and defensive allegations that do not concern the issue now under consideration, specially denied that the value of the outstanding interest was $23,000.00, but admitted that its value was $2,879.00.

Stone testified that in his opinion the value of the entire tract was diminished by the sum of $23,000.00 upon discovery of the Lo-Vaca pipeline easements thereon, and that the tract as burdened by those easements had a value of $32,917.00. His basis for those figures was: 1) the reduction of the original FHA commitment in the amount of $51,400.00; 2) the loss of income from the redesigned mobile home park; and 3) the cost of redesign of the park. The policy does not insure against loss or damage caused by any of those factors. Stone did not testify as to the value of the outstanding interests. There was no error in striking Stone's testimony since his testimony concerning the value of the 18.639 acre tract "as burdened with the pipeline easements in question" is immaterial to the issue of the value of the outstanding interest.

Mr. John Ericson, an appraiser, was called as an expert witness by Stone. He stated that he had made an appraisal of the 18.639 acre tract as of March 12, 1971, the date the subject property was purchased by Stone. He further stated that an appraiser generally uses one of three approaches in arriving at an opinion as to the value of a tract of land, which are: 1) the market value approach, where comparable sales are considered; 2) the cost approach, where "the building or structure is reproduced"; and 3) the income capitalization approach, where the gross expenses are deducted from the gross income, "bringing it down to a net income", which is then "capitalized into an indication of value that is produced by the project". At that point, Lawyers Title objected to his testifying based on "the income capitalization cost", on the grounds that in this case the measure of damages is the market value of the outstanding interest, and for the further reasons that such an approach is speculative, remote, conjectural and involves many unknown factors. The objections were sustained, and Mr. Ericson's testimony in that respect appears in the record only on a bill of exception.

Mr. Ericson, on the bill, testified that he first took into consideration the fact that a special use existed for the use of this tract (mobile home park), and the fact that the FHA had issued a commitment with respect to the development of the property as a mobile home park. He further testified that the prior issuance of the commitment did in fact have some effect on the value of the land on March 12, 1971, and that "most land is purchased on future benefits to be derived from whatever use that land is to be put to". He then testified that the market value of the 18.639 acre tract without being burdened with the pipeline easements, on March 12, 1971, was $55,917.00, and that the outstanding interests, considered alone, did have a market value as of that date. However, he went on to say that in this particular instance, his definition of market value, "the willing buyer, willing seller concept", could not be applied to the 18.639 acre tract, because "the value is not in the market", and the easements on the tract "would not stand the test of market definition". He then stated that he used the "income capitalization" test in determining the value of the tract, as burdened by the easements, based on rental income from the mobile home spaces from the redesigned park. In summary, he testified that the market value of the entire tract, $55,917.00, was diminished by $23,000.00 because of the easements, and that its market value as burdened by the easements was $32,917.00. His opinion concerning the diminished value of the 18.639 acres was based on the projected rental income of the park; projected future occupancies and occupancies; estimated management fees

and expenses; capitalization rate, et cetera. Such testimony, as a basis for an opinion concerning market value, is too speculative to be considered. *Lower Nueces River Water Supply District v. Sellers*, 323 S.W.2d 324 (Tex.Civ.App.—San Antonio 1959, writ ref'd n. r. e.); *Breithaupt v. State*, 321 S.W.2d 361 (Tex.Civ.App.—Waco 1959, ref'd n. r. e.); *Frankfurt v. Texas Turnpike Authority*, 311 S.W.2d 261 (Tex.Civ.App.—Texarkana 1958, no writ).

Neither Stone nor Ericson testified as to the value of the outstanding interest, the pipeline easements. Their testimony concerning the value of the approximately 17.6 acres remaining after excluding the area in the easements, their testimony concerning the diminished value of the entire tract because of the easements, and their testimony as to their "opinion of the value of the 18.639 acres of land in question as of March 12, 1971, if not burdened, with the pipelines and pipeline easements and its value if burdened with them" does not meet the test imposed by *Prendergast,* supra. The trial court properly excluded the testimony of both Stone and Ericson with respect to value. Points 13 and 32 are overruled.

The trial court also sustained Lawyers Title's special exception to that portion of Stone's pleading where he alleged that the cost of removing the pipelines in question was $125,000.00, and that the failure of Lawyers Title, after demand made on it, to remove both the easements and the pipelines from the subject land entitled him to a recovery of the face amount of the policy ($55,917.00). The court further refused to admit into evidence the written interrogatories to and answers by Lo-Vaca concerning the cost of the removal of the pipelines from the easements. Stone complains of those rulings in points 21 and 24.

■ The cost of the physical removal of the pipelines is not a measure of damages in this case. Stone, the insured, is limited to a recovery of actual damages sustained by him because of the failure of title to the 25-foot strip occupied by the Lo-Vaca easements. The interrogatories in question were submitted to Lo-Vaca, and to no one else. They were answered by Lo-Vaca, who was not a party to the suit at the time of trial. The answers to the interrogatories cannot be used by Stone as evidence in his suit against Lawyers Title, since they "may be used only against the party answering the interrogatories". Rule 168, T.R.C.P.; *Black v. Frank Paxton Lumber Co.*, 405 S.W.2d 412 (Tex.Civ.App.—Dallas 1966, writ ref'd n. r. e.); *General Plywood Corporation v. Collins*, 414 S.W.2d 224 (Tex. Civ.App.—Amarillo 1967, no writ). Points 21 and 24 are overruled.

■ We have considered Stone's points 34 and 35, wherein he contends that it was error for the trial court to refuse to admit into evidence testimony concerning the reduction in the amount of the FHA's commitment to insure upon completion of improvements due to the discovery of the pipelines and pipeline easements on the property. The points have no merit. The matter of the reduction of the FHA commitment is immaterial and irrelevant to any issue in Stone's action against Lawyers Title. Points 34 and 35 are overruled.

Stone alleged in this third amended petition, which was filed on May 18, 1973, that he had either paid or had obligated himself to pay $3,275.00 as attorneys' fees "on said case", and "by the conclusion of the trial of this cause, Plaintiff will have incurred the additional expense of attorneys' fees in the amount of $4,000.00", for which he sought a recovery against Lawyers Title. A special exception was levelled by Lawyers Title to those allegations on two grounds; one of the grounds reads as follows:

"(2) Alternatively, if Plaintiff is entitled to recover attorneys' fees, such recovery would be limited to the legal work which his attorneys accomplished in connection with the suit against Lo-Vaca Gathering Co. and under such circumstances Plaintiff should be required to allege specifically what part of such overall work related to the suit against Lo-Vaca Gathering Co. and what would constitute a reasonable attorneys' fee for such part of the legal services rendered."

The exception was sustained by an order of the trial court, which was signed on July 31, 1973. Stone alleged, in his fifth amended petition, which was filed on February 22, 1974, that he was entitled to a recovery of $2,975.00 from Lawyers Title for attorney's fees for legal services rendered "on said case through January 12, 1973".

The trial court, by order signed on February 7, 1975, directed that Stone strike from his fifth amended petition all pleadings for attorney's fees. Stone, in points 16 and 17, attacks the order which sustained the exception and the order which required him to strike all pleadings for attorney's fees from his trial petition. Points 18, 19 and 20 complain of the refusal by the trial court to admit into evidence the testimony of Robert M. Kendrick and that of C. Edwin Prichard, Jr. relating to attorney's fees.

It was held in *Shaver v. National Title & Abstract Co.*, 361 S.W.2d 867 (Tex.Sup. 1962), that an insurer under an owner's title insurance policy, upon receipt of proper notice and demand by the insured to litigate for the removal of an easement and pipeline across the subject land which impairs the title which was guaranteed to be good and indefeasible, is required to do so where an adverse claim (because of the outstanding easement) is asserted against the insured's title. It was further held in that case that failure by the title company to defend, or to pay the damages demanded, will subject it to payment of attorney's fees and court costs incurred by the insured where he is forced to file suit to secure relief against the adverse claim.

The allegations in the third amended petition were not limited to a claim for attorney's fees for prosecuting the action against Lo-Vaca. Stone sought a recovery of attorney's fees in the actions against *all* defendants. Under the circumstances, those allegations were subject to special exception.

Stone filed his original petition on January 21, 1972. His attorney at that time was Mr. Charles Bonniwell. Mr. Kendrick, an attorney, testified on a bill of exception that he became associated with Mr. Bonni-well in the practice of law at Corpus Christi in January, 1972, and that such association continued until April 30, 1974, when Mr. Bonniwell was killed in an airplane crash. He further testified that he did not have any personal knowledge of what Mr. Bonniwell did for Stone in connection with the action brought against any particular defendant.

Mr. Prichard, Stone's attorney from sometime after January 21, 1972 up to and including the time of this appeal, also testified on a bill of exceptions. He reviewed in detail the legal services which he rendered to Stone in connection with this case. He testified that his legal services included: conferences with various attorneys who represented the defendants in the case; conferences with appraisers; pre-trial conferences and hearings that involved *all* defendants; re-pleading because of special exceptions filed by some of the defendants; preparation of and attendance at hearings on various motions filed by the defendants; and preparation for trial on the actions against *all* defendants. He stated that his basic theory in joining all of the defendants in one suit was "to free this property from the easement, if we could do so", and "if we could not do that, then to recover under the policy, and to recover against the defendants in tort if we had anything in tort". He further testified that he never called upon Lawyers Title to "actually bring suit and evict Lo-Vaca from the easement", and that $2,075.00 was a reasonable charge for the time spent for the time he was employed by Stone until January 12, 1973 "for the determination of the standing of the various parties in the case and the determination that the Lo-Vaca easement was a valid easement outstanding against the property". When asked if he had a breakdown of the time he devoted to the case, he replied:

"I do not have a breakdown as to each particular defendant . . . I don't think that it could be broken out so to speak. I think it's all interwoven."

In order for Stone to recover attorney's fees from Lawyers Title, it was in-

cumbent upon him to both allege and prove the reasonable value of legal services rendered in enforcing the terms of the title policy against the issuing title company, as distinguished from the value of the legal services rendered in the attempt to recover damages from others for breach of contract, for fraud, and for negligence. This he did not do. Stone did not allege or offer any proof of the amount of money that would constitute reasonable attorney's fees which related solely to the suit against Lo-Vaca.

Under the record before us, it can only be concluded that the attorney's fees alleged were for attorney's fees incurred in suing *all* defendants. Even though we were to hold that the allegations contained in both the third and the fifth amended petitions sufficiently alleged a cause of action against Lawyers Title for the recovery of attorney's fees, and that it was error for the trial court to sustain the special exception and to order that all pleadings for recovery of attorney's fees be stricken in the trial petition, a reversal in this case is not warranted.

Rule 434, T.R.C.P., provides, in part, "that no judgment shall be reversed on appeal and a new trial ordered in any cause on the ground that the trial court has committed an error of law . . . unless the appellate court shall be of the opinion that the error complained of amounted to such a denial of the rights of the appellant as was reasonably calculated to cause and probably did cause the rendition of an improper judgment in the case." That portion of the rule has been interpreted to mean that in order to obtain a reversal, the appellant must show not only that an error of law was committed, but also that it probably caused rendition of an improper judgment. *City of Galveston v. Hill,* 151 Tex. 139, 246 S.W.2d 860 (1952); *South Texas Icee Corp., Inc. v. John E. Mitchell Co.,* 489 S.W.2d 668 (Tex.Civ.App.—Corpus Christi 1973, writ ref'd n.r.e.); *Vise v. Foster,* 247 S.W.2d 274 (Tex.Civ.App.—Waco 1952, writ ref'd n.r.e.). The excluded testimony, if admitted into evidence, would not have established the attorney's fees with

respect to the suit against Lo-Vaca; instead, it would have established conclusively that the attorney's fees sued for were incurred in preparing the case against *all* defendants. Therefore, if there was error in sustaining the special exception and in ordering the pleadings concerning attorney's fees stricken, they were harmless errors. Points 16, 17, 18, 19 and 20 are overruled.

## THE ACTION AGAINST LIPNER AND THE AGENCY

Points 14 and 15 assert that the trial court erred in sustaining Lipner's and the Agency's special exceptions to Stone's third amended petition which resulted in the elimination of his cause of action against them for recovery of attorney's fees. Unless provided by statute or by contract between the parties, attorney's fees incurred by a party to litigation are not recoverable against an adversary in an action in tort or in a suit upon a contract. *Wm. Cameron & Co. v. American Surety Co. of New York,* 55 S.W.2d 1032 (Tex.Comm'n App.1932). We have no statute in this State which permits the recovery of attorney's fees in actions such as those brought against Lipner and the Agency. The points are overruled.

Stone, in point 25, attacks the action of the trial court in sustaining the special exception of Lipner and the Agency to his third amended petition for the reason that the ruling eliminated Stone's cause of action against them based on negligence for failure to show the pipeline easements as an exception in the owner's title policy. The point cannot be sustained.

The Agency was the agent of Lawyers Title with authority to countersign the latter's title policies on lands in Nueces County. Lipner was the president of the Agency. In *Wolff v. Commercial Standard Ins. Co.,* 345 S.W.2d 565 (Tex.Civ.App.—Houston 1961, writ ref'd n.r.e.), it was held that a title insurance company owes no duty to its insured to point out any outstanding encumbrances, and that the only duty a title insurance company has to its insured is to indemnify him against loss

suffered by defects in title. In ruling on an almost identical point, it was held in *Prendergast v. Southern Title Guaranty Co.,* 454 S.W.2d 803 (Tex.Civ.App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.), that a title insurance company was not a title abstractor employed to examine title, and the title company assumed no duty to the insured with reference to an examination of title. No cause of action for negligence exists against a title company for failure to discover defects in title prior to the issuance of the title policy. The very nature of the relationship between the parties precludes any recovery for negligence. There is no reason to apply a different rule in this case, where the insured has sued the agent and its president, who countersigned the title policy for negligence. Point 25 is overruled.

Where there is an appeal from a judgment which grants an instructed verdict, the appellate court is required to review the evidence most favorable to the appellant, to indulge against the judgment every inference that may be properly drawn from the evidence, and to disregard all conflicting evidence. *Seideneck v. Cal Bayreuther Associates,* 451 S.W.2d 752 (Tex.Sup.1970); *Bass v. General Motors Corporation,* 491 S.W.2d 941 (Tex.Civ.App. —Corpus Christi 1973, writ ref'd n.r.e.).

The test for determining whether or not the instructed verdict should be granted is whether or not reasonable men may differ as to the truth of controlling facts. *City of Fort Worth v. Lee,* 143 Tex. 551, 186 S.W.2d 954 (1945). In order for a defendant to be entitled to an instructed verdict, the plaintiff's evidence must be so weak that reasonable people could not differ as to the conclusion that the plaintiff's proposition is not established. *Perren v. Baker Hotel of Dallas,* 228 S.W.2d 311 (Tex. Civ.App.—Waco 1950, no writ). Upon a motion for instructed verdict, the trial court, without passing upon the credibility of witnesses, accepts as true all evidence which, when liberally construed in favor of the adverse party, tends to support such adverse party's contention. *Mellette v.*

*Hudstan Oil Corp.,* 243 S.W.2d 438 (Tex.Civ. App.—El Paso 1951, writ ref'd n.r.e.).

In addition to suing Lipner and the Agency because of negligence, Stone also sued them for fraud. Lipner's third counterpoint asserts the correctness of the trial court's ruling concerning the action for fraud on the ground that there were no pleadings, supported by evidence, that Lipner made any representation of a fact that was false.

Stone, in points 1 to 4, contends that the trial court erred in granting Lipner's and the Agency's motion for instructed verdict because: there was evidence that Lipner made a representation to him of a fact that was false; there was a showing that a duty existed between Stone and Lipner and the Agency "in regard to the making of a representation or the omission of making a statement of fact"; there was evidence that Lipner knowingly made a false representation to Stone, while acting as the agent of the Agency; and the uncontradicted evidence showed as a matter of law that Stone did rely to his detriment on the statements made by Lipner.

Where an action is based on fraud, facts constituting fraud must be alleged and such allegations must present issues to determine the existence of fraud. *Baines v. Mensing,* 75 Tex. 200, 12 S.W. 984 (1889); *Allen v. Lasseter,* 35 S.W.2d 753 (Tex.Civ.App.—Waco 1931, writ ref'd). The facts and circumstances relied on must be set out in the petition so that it may be determined from the petition itself whether the facts and circumstances alleged, if true, amount to fraud. *Scott v. McWilliams,* 60 S.W.2d 491 (Tex.Civ.App.—El Paso 1933, writ dism'd); *Burchill v. Hermsmeyer,* 212 S.W. 767 (Tex.Civ.App.—Fort Worth 1919, no writ).

Fraud is never presumed, and it is a rule of universal application that until fraud is alleged and proved, the presumption is in favor of the fairness of the transaction. *Turner v. Lambeth,* 2 Tex. 365 (1847); *Hazle v. McDonald,* 449 S.W.2d 343 (Tex.Civ.App.—Dallas 1969, no writ). And,

it has been said that a court should "presume a want of fraud rather than the existence of fraud in a transaction". *Hawkins v. Campbell*, 226 S.W.2d 891 (Tex.Civ.App.—San Antonio 1950, writ ref'd n.r.e.).

It is stated in 26 Tex.Jur.2d, Fraud and Deceit, § 99, p. 61:

" . . . Allegations concerning fraudulent representations on which the cause of action is based should be clear; the pleading should contain specific allegations of the acts and conduct relied on and be definite and certain . . . Fraud must be specifically alleged, but there are no hard and fast rules as to how that should be done . . . The amount of detail with which fraud should be alleged differs with respect to the facts of each case . . . If a general rule can be stated, it may be said that the petition is sufficient if the allegations show clearly the devices and misrepresentations that were adopted to bring about the alleged deceit. . . ."

Under Rule 45, T.R.C.P., pleadings shall be couched in "plain and concise language", and "shall be so construed as to do substantial justice". It has always been the general design and policy of the Texas system of pleading to require the litigants to set out (in their pleadings) in plain and intelligible language the facts upon which they rely. *Gunnells Sand Company v. Wilhite*, 389 S.W.2d 596, (Tex.Civ.App.—Waco 1965, writ ref'd n.r.e.). The office of a pleading is to define the issues to be tried. *Williams v. City of New York Ins. Co.*, 210 S.W.2d 219 (Tex.Civ.App.—El Paso 1947, writ ref'd n.r.e.). The purpose of a pleading is to inform the court and the adverse party of what the contentions of the pleader will be at the trial of the case. *C. D. Shamburger Lumber Co. v. Delavan*, 106 S.W.2d 351 (Tex.Civ.App.—Amarillo 1937, writ ref'd). While technical exactness is not required, in a strict rule of grammatical construction need not always be applied, a pleading must give fair and adequate notice of the facts which the pleader relies upon in order that the adverse party may properly prepare his defense thereto. *McCamey v.*

*Kinnear,* 484 S.W.2d 150 (Tex.Civ.App.—Beaumont 1972, writ ref'd n.r.e.).

It has long been settled that a plaintiff must recover, if at all, only upon the cause of action alleged by him, and upon the facts stated in his pleadings as a basis of that cause of action; he cannot recover upon facts different from that asserted in such pleadings, unless there has been a consent to the trial of issues outside the pleadings. *Jennings v. Texas Farm Mortg. Co.,* 124 Tex. 593, 80 S.W.2d 931 (1935); *Gulf Coast Investment Corporation v. Prichard,* 438 S.W.2d 658 (Tex.Civ.App.—Dallas 1969), aff'd 447 S.W.2d 676 (Tex.Sup. 1969). The language used by a plaintiff in his pleadings, and the specific words and phrases employed by him, are to be accorded their logical and obvious intendments and implications. *Texas & Pacific Ry. Co. v. Bayliss,* 62 Tex. 570 (1884); *Swift & Company v. Bennett,* 373 S.W.2d 569 (Tex. Civ.App.—Texarkana 1963, writ ref'd n.r. e.).

A petition may fail to give fair notice to the defendant because of ambiguous language therein which does not convey to the defendant a clear picture of plaintiff's contention or of the facts which he relies upon in support of his contention, or, it may fail to give fair notice because its allegations, though clearly expressed, may mislead the defendant as to the theory on which the plaintiff seeks a recovery. See 2 McDonald, Texas Civil Practice, § 5.05 (1970).

Stone alleged that in preparing for the closing of the real estate transaction called for in the contract of sale, that the attorney for the Agency made an examination to the subject property on ¨November 10, 1971, which listed, among other items, the pipeline easements in question as an encumbrance to the property. It was further alleged that the title opinion was delivered to Lipner shortly after it was written. Concerning the representations that Lipner made to Stone, the following allegations appear in the petition on which Stone went to trial, to-wit:

" . . . On March 12, 1971, or within a few days just prior thereto, the Defendant ELI LIPNER called the Plaintiff by telephone and stated that JOE WEIL was in his office and that there was some confusion over pipeline easements, and asked the Plaintiff if he knew of any pipeline or easement on the property. The Plaintiff replied that he did not know of any, but that Mr. LIPNER was the one who was supposed to be able to search the records out. Mr. LIPNER then hung up without divulging the details of the confusion. Later that same day or the next day or two thereafter, JOE WEIL came to see the Plaintiff and told him that everything was straightened out and that Mr. LIPNER was mistaken as to where the pipeline easement was. To verify that the matter was straightened out, the Plaintiff telephoned Mr. LIPNER either on or just prior to March 12, 1971, and asked if everything was squared away. Mr. LIPNER replied that it was, and that there would be no exceptions in the Title Policy. . . ."

Stone then alleged that the statement "everything was squared away", coupled with the fact that Lipner then caused to be issued an owner's title policy and a mortgagee's title policy binder on an interim construction loan on the 18.639 acres, and further approved the transfer of title by warranty deed, none of which mentioned pipeline easements, constituted representations by Lipner and the Agency "that the title to the land that plaintiff was buying was not burdened with pipelines or pipeline easements". Stone further alleged that these representations were made with the intention that they be acted upon in the manner reasonably contemplated; that he relied upon the representations which were of material facts; that they were willfully made by Lipner, and Lipner knew, or in the exercise of reasonable care should have known, that they were false; that he (Stone) did not know that the statements were false at the time they were made; and that he sustained damages because of such misrepresentations.

We first direct attention to the allegations concerning the title opinion prepared by the Agency's attorney and delivered to Lipner before March 12, 1971. Stone argues that the failure by Lipner to disclose to Stone the contents of the title opinion with respect to the easements amounted to fraud. There are no allegations to that effect, and Stone's position in that regard can only be sustained by resorting to inferences, which we refuse to do.

■ When the alleged fraud arises because of a failure to disclose facts, a duty, because of either a confidential or fiduciary relationship, to disclose those facts must exist in order to make such failure actionable as fraud. *Moore & Moore Drilling Company v. White,* 345 S.W.2d 550 (Tex.Civ. App.—Dallas 1961, writ ref'd n.r.e.); *Phillips Petroleum Co. v. Daniel Motor Co.,* 149 S.W.2d 979 (Tex.Civ.App.—Eastland 1941, writ dism'd judgm't cor.). Here, there are no allegations of fact which, if true, would have imposed a duty on Lipner to disclose the contents of the title opinion to Stone. See *Prendergast v. Southern Title Guaranty Company,* 454 S.W.2d 803 (Tex.Civ.App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.). Facts required to establish a confidential or fiduciary relationship between Stone and Lipner were not alleged. Such an inference is not warranted even by the most liberal construction of the fifth amended petition. Furthermore, the only privity of contract between Stone and Lipner (and the Agency) that is alleged is that which arose by virtue of the issuance of the owner's title policy. The petition does not allege actionable fraud because of Lipner's failure to disclose (to Stone) the contents of the attorney's title opinion.

The only allegations of fact with reference to fraud by Lipner because of a representation that was alleged to be false is limited to the above-quoted portion of the petition. The other allegations of fact, i. e., that Lipner caused to be issued the owner's title policy and the mortgagee's title binder and approved the deed, none of which mentioned the easements as an exception to the

title of the 18.639 acre tract, do not, of themselves, constitute fraud.

The allegation that the statement by Lipner that "everything was squared away", coupled with his acts constituted representations that "the title to the land was not burdened with pipelines or pipeline easements" is not an allegation of fact. It is a mere conclusion by the pleader.

■ A special allegation controls over a general allegation. *Monsanto Company v. Milam*, 494 S.W.2d 534 (Tex.Sup.1973). In determining whether a lawsuit could be maintained on the basis of the plaintiff's pleading, it was said in *Houston Printing Co. v. Hunter*, 105 S.W.2d 312 (Tex.Civ.App. —Fort Worth 1937), aff'd 129 Tex. 652, 106 S.W.2d 1043(1937):

" . . . The rule of law seems to be well settled in this state that, if plaintiff pleads generally a state of facts, and goes farther and pleads specifically and particularly on the same subject, he cannot rely upon the general allegations, but is confined in his recovery to those specifically and particularly plead. Specific allegations will control those of a general character. . . ."

That rule was quoted with approval in *Richardson v. First National Life Insurance Company*, 419 S.W.2d 836 (Tex.Sup.1967). Applying that rule to this case, it can only be inferred that the meaning of the term "squared away" is limited by the specific allegation "there will be no exceptions in the Title Policy", to which it was coupled. See 2 McDonald, Texas Civil Practice, § 5.07.2 (1970).

■ In order to raise an issue of fact in an action because of an alleged fraudulent representation, it was incumbent upon Stone to introduce probative evidence: 1) that a material representation was made; 2) that it was false; 3) that Lipner knew it was false when he made it, or that he made it recklessly without any knowledge of its truth and as a positive assertion; 4) that Lipner made the representation with the intention that he act upon it; 5) that he acted in reliance upon the representation; and 6) that he suffered injury. *Oilwell*

*Division, United States Steel Corporation v. Fryer*, 493 S.W.2d 487 (Tex.Sup.1973); *Panhandle & Santa Fe Ry. Co. v. O'Neal*, 119 S.W.2d 1077 (Tex.Civ.App.—Eastland 1938, writ ref'd); *Wilson v. Jones*, 45 S.W.2d 572 (Tex.Comm'n App.1932, holding approved). An absence of any one of the above enumerated elements of actionable fraud will be sufficient for the granting of a motion for an instructed verdict. *Panhandle & Santa Fe Ry. Co. v. O'Neal, supra.*

■ The fraudulent representations must be established as pleaded. *Hayden v. Dunlap*, 84 S.W.2d 306 (Tex.Civ.App.—Dallas 1935, no writ). We now examine the evidence. Concerning the representations made by Lipner to Stone in the telephone conversations, which apparently occurred on either March 10 or 11, 1971, Stone testified:

"Q All right. Now just prior to the closing of this transaction on March the 12th of 1971, did you have any conversations with Mr. Lipner or Mr. Weil about pipelines in this 18.639 acres of land?

A . . . Mr. Lipner called me and asked me if I knew of any pipeline easements on the property that I was purchasing, and my words were to the effect that, 'My Lord, Eli, I don't know of anything out there. That's your job. You're supposed to be the one that's being paid to search the title,' and he hung up. Shortly thereafter Joe Weil came up to the office and told me that Eli was confused and that he had it all straightened out. That there wasn't any easements there. There wouldn't be any exceptions in the policy. I called Eli Lipner to confirm that, and he did. That was the reason why I entered into the contract. . . .

*       *       *       *       *       *

Q Now, what was the substance of the conversation when you called Mr. Lipner?

A I wanted to find out from Mr. Lipner personally if Mr. Weil was conveying the correct information concerning the easements, and Mr. Lipner said that it's true, that there was confusion. 'I found out that there were no easements on the property. There will be no exceptions made'."

Counsel for Lipner then made the following objection:

"I am going to object to the portion of the testimony that Mr. Lipner found that there were no easements on the property because that's not what he's pled in his petition. It's variance with his fifth amended petition."

The objection was overruled.

Stone further testified without objection:

"Q Mr. Stone, was there any conversation or any use of a term like 'squared away' in your conversation with Mr. Lipner?

A Yes, there was.

Q Do you recall how that was used or exactly what was said?

A Well, it was first used in vain. That everything was in apple pie order. Everything was squared away. He knew what he was doing."

\* \* \* \* \* \*

"He (Lipner) said that he and Joe Weil had resolved the confusion. That he knew now where the easements were. They were not in the property that I purchased. Words to that effect."

The statement "Everything was squared away" will not support an inference that Lipner told Stone that there were no easements on the property. The testimony, last quoted, by using the phrase "words to that effect" qualifies the statement as being no more than Stone's interpretation of the meaning of Lipner's statement to him, whatever the exact words of Lipner may have been.

■■■ When a specific complaint has been made and an adverse ruling thereon has been obtained from the court, such as an objection to the admission of testimony into evidence on the ground that the prof-fered testimony is at variance with the pleadings, consent to the trial of issues outside the pleadings will not be implied. *Buchanan v. Jean,* 141 Tex. 401, 172 S.W.2d 688 (1943). In the absence of consent to the trial of issues that are outside the pleadings, or where there is a material difference between the allegations and proof as to a particular matter, the defect in pleading will be fatal unless covered by a trial amendment. The pleadings and the evidence normally should present the same theory of offense or defense, as the case may be. Where a plaintiff alleges specific wrongful conduct in one respect, he may not recover upon evidence of some other form of wrongful conduct, assuming, of course, that the defendant timely and properly objected to the introduction of such evidence. 2 McDonald, Texas Civil Practice, § 5.18 (1970). No trial amendment was filed by Stone in the instant case.

■■■ Stone did not allege in precise, plain and concise language that Lipner, at any time, told him that there were no pipeline easements on the 18.639 acres. In that connection, it is noted that Stone, in his second amended petition, alleged that Lipner "verbally represented to Charles C. Stone, Jr., that subject property was not encumbered by pipelines or pipeline easements". Lipner and the Agency filed special exceptions to that statement, and in the amended petitions that were filed thereafter, including the fifth amended petition, that allegation was omitted. Under those circumstances, Lipner was not fairly and adequately advised by the trial petition that Stone would testify at the trial that Lipner told him that "there were no easements on the property". The testimony was inadmissible since it was clearly outside the pleadings and was at variance with the facts that were alleged. The objection should have been sustained. And, had the objection been sustained, there would have been no evidence that Lipner ever represented to Stone that there were no easements on the property. The conclusion that the statements and acts alleged constituted *representations* is materially different from unequivocal testimony that a certain verbal

statement was made. Any contention that the pleadings, liberally construed, are sufficient to allow the introduction into evidence of the statement which Stone said Lipner made to him during their second telephone conversation will only admit of a forced construction brought about by the warping of language from its usual meaning, deducing one fact from another, and inferring that which would give the pleading an interpretation which it ordinarily would not receive.

There is no evidence of probative value that Lipner made a material representation to Stone that was false. Stone's contentions that the statements by Lipner, coupled with the failure to show the easements in the owner's title policy and in a mortgagee's title binder as an exception to the indefeasible title that was guaranteed amounted to a representation that there were no pipeline easements on the subject property, which was false, cannot be sustained.

It is undisputed that a contract of sale between Goodstein, as seller, and Stone, as buyer, covering the 18.639 acres was signed on February 19, 1971. The contract was drafted by Stone's attorney. It did not provide that the proposed sale would be made subject to any pipeline easements on the property, but did provide that the contract would be closed only if Stone received a FHA loan commitment. The contract, among other provisions, advised Stone:

".  .  .  that he should have the abstract of title covering subject property examined by an attorney of buyer's over selection, or should be furnished with, or obtain a policy of title insurance thereon, and seller agrees to furnish buyer a policy of title insurance to be issued through the Lawyers Title Insurance Corporation, in the usual and customary form  .  . ."

Stone admitted that the deed, dated March 11, 1971, which conveyed the property in question to him was prepared by his own attorney, and that his attorney also prepared the contract of sale executed on February 19, 1971. Stone further admitted that he did not request his attorney to make a title examination of the subject property for him. It is undisputed that Lipner did not have anything to do with the preparation of the contract of sale, executed on February 19, 1971, and that he did not know of the existence of that particular contract until after it was executed, when he acknowledged receipt of Stone's check for $1,000.00 as earnest money. The allegation that "Lipner approved for transfer of title the warranty deed from Isabel B. Weil (Goodstein)" is without support in the evidence.

On November 12, 1970, the examining attorney for the Agency prepared a written title opinion which showed the easements in question as encumbrances to the title to the 18.639 acre tract. There is no evidence that Lipner personally knew of the existence of any pipeline in any of the easements. Lipner said that he did not talk with the examining attorney prior to March 12, 1971, concerning any easements on the land, because he was under "the impression that those pipelines were in that so-called 25 feet pipeline alley". His testimony in that respect was, as follows:

"Q  But now these other pipelines, the Magnolia, the Lo-Vaca, the Seagraves and the Southern Pipe Line, those were found but were eliminated by you.

A  That's correct, because we were under the impression—at least I was under the impression—that those pipelines were in that so-called 25 feet pipeline alley.

Q  Now, was that decision to eliminate those pipelines strictly up to you?

A  That was my decision.

Q  And you did so on your own volition?

A  My mistake of judgment, yes, sir.

Q  It was a willful act, though, that you did?

A  It was not a willful act, no, sir."

He further stated that the easements were not "wilfully" left out of either the owner's title policy or the mortgagee's title binder, and that he was not deliberately "trying to hide something under the table" from

Stone, but that he made a mistake in "believing a friend of mine" (Weil), who, he thought, "honestly believed that's where the pipelines were". Those statements were not disputed by any testimony from Stone or from any other witness.

There was in existence at all times pertinent to this lawsuit certain records in the Agency's abstract plant, commonly called "take-off" cards. When asked if the cards (which were introduced into evidence) contained a description of "this particular pipeline," Lipner replied:

"A  Yes, sir, it does.  And I have admitted numerous times today that we made a mistake on our part for leaving that out  .  .  .."

Further questions and answers on the subject are:

"Q  Well, Mr. Lipner, we are contending that you made more than a mistake. That you did it intentionally.

A  What does intentionally mean?

Q  That you knew about these things and that you eliminated them intentionally.

A  I did not know about them.

Q  All right.

A  I did not have those cards before me when this Title Policy was issued."

Stone also alleged:

".  .  .  The defendant Eli Lipner, as president of Lawyers Title Corpus Christi, was also requested by the plaintiff to issue a mortgagee's title policy binder on an interim construction loan to Corpus Christi Savings and Loan Association in the amount of $370,000.00 .  .  .."

There is no evidence in the record that plaintiff ever made such a request.  On the contrary, it is undisputed that Corpus Christi Savings and Loan Association, at some date prior to March 12, 1971, requested the Agency (and Lipner) to issue such a binder.  There is no evidence that Stone ever saw the binder until March 12, 1971, which was one day after the deed was executed.  The only mention of Stone in the binder was the reference to the deed of

trust on the subject property dated March 12, 1971, executed by him to secure Corpus Christi Savings and Loan Association in the payment of his note in the amount of $370,-000.00.  Privity of contract between Stone and the Agency because of the execution and delivery of the mortgagee's title binder was neither alleged nor raised.

Stone attempts to characterize the issuance of the mortgagee's title binder as being equivalent to the ordering of an abstract of title, duly certified by the abstractor.  This attempt must fail.  There is no similarity between a title binder (or a title policy) and an abstract of title.

The statement made by Lipner that there would be no exceptions in the owner's title policy or in the mortgagee's title binder was true.  Neither the policy nor the binder, as issued, contained any exceptions (other than those which are immaterial to this case). The title policy guaranteed to Stone exactly what he contracted to purchase on February 19, 1971, and did purchase on March 11, 1971.

■ The failure to show the easements as an exception in a title policy and in the title binder, of itself, will not support an action for fraud against either Lipner, or the Agency.  There was no duty upon the Agency or upon Lipner, who countersigned the title policy as the agent for Lawyers Title, to show any encumbrance upon the title in either the policy or the binder. *Wolff v. Commercial Standard Ins. Co.,* 345 S.W.2d 565 (Tex.Civ.App.—Houston 1961, writ ref'd n. r. e.); *Prendergast v. Southern Title Guaranty Co.,* 454 S.W.2d 803 (Tex. Civ.App.—Houston [14th Dist.] 1970, writ ref'd n. r. e.).  Lipner, neither individually nor as an agent of the agency, assumed any duty to Stone with reference to an examination of title for him.

There is no evidence that Lipner knowingly made a false statement to Stone. There is no evidence that Lipner made any representation "recklessly" without any knowledge of its truth and as a positive assertion.  The adjective "reckless" has been defined as meaning a state or quality of wanton disregard of the rights of others,

or a conscious indifference to the results which may follow as a consequence of one's acts. 76 C.J.S. 70. There are no facts from which it can be presumed that Lipner acted in any such manner. On the contrary, it is shown that Lipner was concerned about the matter of easements for he telephoned Stone on March 10 or 11, 1971, and told him about the "confusion" and asked Stone if he knew anything about the easements; later that same day he was reassured by Weil that there were no easements on the land then subject to the contract of sale. The admissible evidence in this case will not permit an inference to be drawn from the events which took place on the day in question that Lipner made a "reckless" statement to Stone in wanton disregard of Stone's rights, or in indifference to the results which might follow. The fact that Lipner, based on his belief that the pipelines were actually in "pipeline alley", eliminated the easements which were set out in the title opinion and did not personally examine the "take-off" cards does not raise the issue of "reckless" action.

Stone argues that he had three contacts with Lipner during the 48-hour period prior to March 12, 1971. It was during these contacts that the "misrepresentation" that he says he "relied on" occurred. Those contacts were: 1) the two telephone conversations on either March 10 or 11, 1971; and 2) March 12, 1971, when the owner's title policy and the mortgagee's title binder were signed. The contract of sale was completed, according to the only evidence in the record, on March 11, 1971, when the deed was executed by Goodstein, and presumably delivered. There is no evidence that it was not delivered on the day it was executed.

Concerning the element of "reliance", Stone testified, in part, as follows:

"Q Mr. Stone was there anything in particular that you relied upon in entering into the contract of February 19th, 1971?

A I would not have entered the contract to purchase this land under any condition if Mr. Joe Weil had informed me of the knowledge and conversations he had. I would not have entered this contract in any manner when we went down to Mr. Lipner's office to sign the contract if he would've said that there were easements on this property or if the Owner's Title Policy said it, and certainly the Title Binder, that I borrowed the money on.

\* \* \* \* \* \*

Q Now, at the time of closing this particular transaction, did you in any way rely on these statements (by Lipner) that you have just described?

A I relied on Mr. Lipner and Mr. Weil one hundred percent. If there would have been any doubt, any question in the mind of Charles C. Stone, Jr., that he was purchasing a piece of property that was encumbered with easements, I would not have entered into the contract."

The foregoing statement "I relied on Mr. Lipner and Mr. Weil one hundred per cent" must be considered along with the next succeeding statement, both of which made up the answer to the question that was asked. The answer, in its entirety, cannot be construed as testimony that Stone relied on any statements made by Lipner at the time of closing. See *Monsanto Company v. Milam*, supra.

Stone further testified:

"Q With regard to the actual closing of the transaction, where the various instruments were prepared, delivered, and the money exchanged and so on and so forth, was there any reliance by you placed upon the particular instruments involved, and if so, which ones?

A I relied upon the mortgagee's title binder complete—Yes, sir. I relied on the Mortgagee's Title Binder for $370,000.00 payable to me to get an instruction bill (sic) for a Mobile Home. I relied on the Owner's Title Policy, which stated no exceptions in the Policy that would encumber the Policy."

Concerning title, Stone had an election under the contract of sale: 1) he could (at his own expense) have ordered an abstract for examination by his own attorney; or 2) he could have decided upon title insurance (at the expense of the Seller). He chose the latter. The title opinion which was written by the Agency's attorney to the Agency was personal to the Agency and was prepared for its exclusive use and benefit. It did not inure to the benefit of Stone, a complete stranger to that transaction.

Under the record before us, there is nothing that would have legally excused Stone's refusal to close the transaction in accordance with the terms of the contract. Title insurance was furnished in accordance with his request and at his election. It is conclusively established by the evidence that Stone had obtained a final commitment from the Federal Housing Administration (FHA) prior to the time the transaction was closed. On March 12, 1971, all of the terms of the contract had been met and fulfilled. Certainly, the conversations did not induce him to enter into the contract of sale; it was entered into some 18–20 days before the conversations took place. A person may not rely upon impossibilities. Certainly, the conversations were not a factor in the closing of the transaction, because it was closed in exact accordance with the contract; in accordance with Lipner's statement that "there will be no exceptions in the title policy"; and in accordance with Stone's statement that he had to have a title binder that showed no exceptions in order to get the final FHA commitment as a prerequisite to securing the loan for $370,-000.00. The element of "reliance" was not raised by the evidence.

The trial court properly granted the motion for instructed verdict in favor of Lipner and the Agency. First, there is no evidence, supported by pleadings, that Lipner made any representation to Stone of a fact that was false. Second, the evidence fails to raise *all* of the elements of actionable fraud in the action brought against Lipner and the Agency. Tested by the rules laid down by the foregoing cases and authorities, Stone's fifth amended petition will not support a judgment against either Lipner or the Agency for misrepresentation of a material fact which induced Stone to close the transaction. Points 1, 2, 3 and 4 are overruled.

## THE ACTION AGAINST WEIL

Weil, in his motion for instructed verdict, alleged: that Stone, as a matter of law, could not have relied upon any representations made by him, since he relied solely on an owner's title policy; that the provisions of real estate sales contract showed, as a matter of law, that Stone did not rely on any representation made by Weil; that there was no evidence that Stone did or failed to do anything which, but for the representations of Weil, he would have done differently; that there was no evidence that any representation made by Weil was made for the purpose of inducing Stone to purchase the land; that Stone, as a matter of law, could not have relied upon any representation by Weil concerning the location of the pipelines because Weil did not own and never represented to Stone that he owned any part of the 70 acre tract; and that Stone had actual knowledge of the existence of the pipelines and easements on the 70 acre tract. Stone challenges those grounds and the judgment in points 6 to 11.

It is undisputed that Stone contacted Weil in late 1969 or in early 1970 about acquiring acreage out of the 70 acre Goodstein tract for mobile home park purposes. Weil, a real estate broker, was fully advised at that time of Stone's planned project. The 70 acre tract was shown to Stone by Weil. Stone said that Weil told him then that the tract was free of all encumbrances except for a lien thereon, and further testified:

". . . I emphasized to Mr. Weil that this land had to be completely free of any encumbrances, meaning a pipeline easement. I explained to Mr. Weil that I could not get a loan on this land if it was encumbered with an easement.

\* \* \* \* \* \*

. . . He (Weil) pointed to the west and to the east of what's been referred to by Mr. Lipner as pipeline alley, as being the area where all the pipeline easements were located in that 25-foot area. That there was nothing transversing the property which I was considering at that time which has been referred to as 60 or 70 acres in the testimony that has come out.

\*      \*      \*      \*      \*      \*

. . . I relied totally on Mr. Weil . . . to explain anything that he knows about the property then or might come to know at a later date."

Stone also said that Weil pointed out on a plat of the 70 acre tract "the 25-foot easement where all of the pipelines were supposed to be", and that this strip of land was not in the bounds of the 18.639 acre tract. It is further established both by evidence and from inference which can be reasonably drawn from the evidence that Weil, as late as March 10, 1971, again assured Stone that there were no easements on the land then under contract of sale. Stone testified that he would not have entered into the contract of sale with Goodstein and would not have purchased the land had he known of the existence of the easements in question.

■ The contract of sale between Goodstein and Stone also provided that Katz Associates, with whom Weil was associated, were to be paid a 6% commission of the purchase price upon closing. Presumably, the commission was paid and Weil benefitted therefrom. All of the negotiations and conversations that led up to the signing of the contract of sale were between Stone and Weil. Stone never had any contact with Goodstein prior to date of trial.

There is no evidence that Stone had actual knowledge of the existence of the easements and pipelines here involved. There is no evidence that there was any visible sign of the pipelines on the 18.639 acre tract. At the outset, Stone was advised by Weil that all of the pipelines and pipeline easements were confined to the most southerly 25-foot strip of the 70 acre tract, which was referred to as "pipeline alley". The land purchased by Stone was adjacent to and north

of that strip of land. Under the circumstances, in view of the representations made by Weil and of his knowledge of the 70 acre tract, Stone was under no duty to make an independent investigation of his own concerning the location of the pipelines that traversed the Goodstein land. *Rowntree v. Rice,* 426 S.W.2d 890 (Tex.Civ.App—San Antonio 1968, writ ref'd n. r. e.); *Old National Life Ins. Co. v. Bibbs,* 184 S.W.2d 313 (Tex.Civ.App.—Austin 1944, writ ref'd w. o. m.). There is evidence that Stone sustained considerable damages because of the easements and pipelines.

In *Peckham v. Johnson,* 98 S.W.2d 408, 416 (Tex.Civ.App.—Fort Worth 1936, affirmed 132 Tex. 148, 120 S.W.2d 786), a confidential relationship was defined as "covering every form of relation between parties wherein confidence is reposed by one in another, and he relies and acts upon the representations of the other and is guilty of no derelictions on his own part." It is established law in this State that business dealings can and often do create a confidential relationship between the parties that will impose duties and obligations on one to the other in the nature of fiducial duties and obligations. *Mac Donald v. Follett,* 142 Tex. 616, 180 S.W.2d 334 (1944). Moreover, a confidential relationship may arise informally from moral, social, domestic or purely personal relationships. *Fitz-Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256 (1951); *Bush v. Stone,* 500 S.W.2d 885 (Tex. Civ.App.—Corpus Christi 1973, writ ref'd n. r. e.). Unquestionably, the issue of whether or not a confidential relationship existed between Weil and Stone, if not conclusively established by the evidence, was raised by the undisputed facts in evidence.

■ Even though there is no evidence that Weil had actual knowledge that there were any easements on the land purchased by Stone, it can be reasonably inferred that the representations by Weil may have been made recklessly without any knowledge of the truth thereof and as a positive assertion of a fact, and that they were made with the intent that Stone act upon them. That

issue should have been submitted to the jury for determination.

If the circumstances were such that Lipner felt justified in relying upon Weil's representations with regard to the location of the pipelines and easements, then it can reasonably be inferred that Stone was justified in relying on those representations. There is evidence which supports Stone's contention that he relied and acted upon Weil's representations, would not have entered into the contract to purchase the land, and would not have closed the transaction, had he not so relied and acted on them. The fact that Stone, long prior to March 12, 1971, incurred considerable expense in obtaining the service of Urban Engineering Company and in meeting the requirements of the FHA in order to obtain a large loan commitment on the planned project is some evidence that Stone relied upon the representations made by Weil, and that he acted on those representations. Additionally, the fact that the park had to be redesigned because of the existence of the pipelines lends credence to Stone's contention that he would not have agreed to accept the south boundary of his land at the place specified by the field notes had it not been for Weil's representations which were made before November 12, 1970.

We conclude that the evidence introduced in Stone's action against Weil raised controverted issues of fact for the jury. There are areas where reasonable minds could differ. The record shows that all of the elements of fraud in the action against Weil were raised, and does not show conclusively that Stone did not rely or act upon the alleged representations made to him by Weil, or that Weil is entitled to judgment as a matter of law. The trial court erred in sustaining Weil's motion for an instructed verdict. Points 6, 7, 8, 9, 10 and 11 are sustained.

### THE ACTIONS AGAINST ALL DEFENDANTS

There is nothing in the record which supports Stone in his claims for exemplary damages against any of the defendants in this case. Points 26, 27, 28, 29, 30 and 31 are overruled.

We have considered all of the points of error brought forward in this appeal. All of the points of error not discussed and those that are inconsistent with this opinion are overruled.

Those portions of the judgment which decreed that Charles C. Stone, Jr. recover $2,879.00 against Lawyers Title Insurance Corporation on the owner's title policy, and that he take nothing against Eli Lipner and Lawyers Title Insurance Agency of Corpus Christi, Inc., are affirmed. That portion of the judgment which decreed that Charles C. Stone, Jr. take nothing against Joe B. Weil is reversed, and the action brought against Joe B. Weil is remanded to the trial court for a new trial.

That portion of the judgment which assessed 1/3rd of the costs in the trial court against Lawyers Title Insurance Corporation is affirmed. That portion of the judgment which assessed 2/3rds of such costs against Stone is reformed, and judgment is here rendered that 1/3rd of the costs in the trial court is hereby assessed against Charles C. Stone, Jr., and the remaining 1/3 of the costs is hereby assessed against Joe B. Weil. The costs incurred in this Court are taxed ½ to Stone and ½ to Weil.

AFFIRMED IN PART, REFORMED IN PART AND AFFIRMED AS REFORMED, AND REVERSED AND REMANDED IN PART.

NYE, Chief Justice (dissenting).

I respectfully dissent. I also withdraw my original Dissenting Opinion and substitute the following Opinion since the majority has changed its reasons and its decision in affirming the trial court's action which granted an instructed verdict against Stone in favor of Eli Lipner and his Agency.

Since this is an instructed verdict case, we must indulge every inference that may properly be drawn from the evidence against the action of the trial judge in withdrawing the case from the jury and instructing a verdict against Stone. *Echols*

*v. Wells*, 510 S.W.2d 916 (Tex.Sup.1974); *Seideneck v. Cal Bayreauther Associates*, 451 S.W.2d 752 (Tex.Sup.1970); *Bass v. General Motors Corporation*, 491 S.W.2d 941 (Tex.Civ.App.—Corpus Christi 1973, writ ref'd n. r. e.); *T–L Drilling Company v. Northern Propane Gas Company*, 516 S.W.2d 710 (Tex.Civ.App.—Corpus Christi 1974, no writ).

The necessary elements of actionable fraud are: 1) that a material representation was made; 2) that it was false; 3) that when the speaker made it, he knew it was false, or that he made it recklessly without any knowledge of its truth and as a positive assertion; 4) that he made it with the intention that it should be acted upon by the party; 5) that the party' acted in reliance upon it; and 6) that he thereby suffered injury. The majority now holds with respect to the action in fraud asserted against Lipner and the Agency: 1) that although there may be some evidence of fraud, such evidence is not supported by the pleadings; 2) that there was no evidence that Lipner made the representations "recklessly" without any knowledge of its truth and as a positive assertion; and 3) that the element of "reliance" was not raised by the evidence. I still disagree.

First, the majority argues that Stone failed to allege in precise, plain and concise language that Lipner told him that there were no pipeline easements on the 18.639 acres. It is not necessary to allege such precise language in view of Lipner's failure to object or except to Stone's Fifth Amended Petition. It has been repeatedly held and is the general rule, so well established that it should need no citation of authority, that the petition will be construed as favorably as possible for the pleader. *Gulf, Colorado & Santa Fe Railway Co. v. Bliss*, 368 S.W.2d 594 (Tex.Sup.1963). Equally as well established is the rule of law that in absence of special exceptions, the petition will be liberally construed in the pleaders' favor. *Scott v. Gardner*, 137 Tex. 628, 156 S.W.2d 513 (1941, opinion adopted); *Hanley v. Oil Capital Broadcasting Ass'n*, 141 Tex. 243, 171 S.W.2d 864 (1943); *Anderson v. McRae*,

495 S.W.2d 351 (Tex.Civ.App.—Texarkana 1973, no writ); *Luse v. Union City Transfer*, 324 S.W.2d 935 (Tex.Civ.App.—Waco 1959, writ dism'd); *Foster v. Lessing*, 346 S.W.2d 939 (Tex.Civ.App.—Waco, 1961, writ ref'd n. r. e.).

With these rules in mind, we go to the admitted testimony that the majority would throw out and disregard. A "conversation" occurred between Lipner, Weil and Stone. Stone testified at the trial concerning this conversation as follows:

"Q Now, what was the substance of the conversation when you called Mr. Lipner?

Answer by Stone:

I wanted to find out from Mr. Lipner personally if Mr. Wil was conveying the correct information concerning the easements, and Mr. Lipner said that its true, that there was confusion. 'I found out that there were no easements on the property. There will be no exceptions made.' "

Lipner's attorney objected to that portion of the testimony that Lipner found out that there were no easements on the property because that was not what Stone had pled in his petition and that it was at variance with his trial petition. The objection was overruled. The majority now asserts that the objection should have been sustained because the statement is not supported by the pleadings and if the objection had been sustained excluding the above evidence, there would have been no evidence that Lipner ever represented to Stone that there were no easements on the property.

In Stone's Fifth Amended Petition, Stone alleges that the following representations were made to him: 1) ". . . to verify that the matter was straightened out, the plaintiff telephoned Mr. Lipner either on or just prior to March 12, 1971, and asked if everything was squared away. Mr. Lipner replied that it was, and that there would be no exception in the title policy . . ."; 2) ". . . he (Lipner) told Mr. Stone that everything was squared away concerning the pipelines . . ."; 3) ". . . these representations were made with the

intention that they be acted upon by the Plaintiff in the manner reasonably contemplated . . .". Unquestionably, the pleadings were sufficient to support the question and answer by Stone as can be seen from a reading of the pertinent portion of Stone's Fifth Amended Petition, to-wit:

## "COUNT I

. . . On March 12, 1971, or within a few days just prior thereto, the Defendant ELI LIPNER called the Plaintiff by telephone and stated that JOE WEIL was in his office and that there was some confusion *over pipeline easements, and asked the Plaintiff if he knew of any pipeline or easement on the property.* The Plaintiff replied that he did not know of any, *but that Mr. LIPNER was the one who was supposed to be able to search the records out.* Mr. LIPNER then hung up without divulging the details of the confusion. Later that same day or the next day or two thereafter, JOE WEIL came to see the Plaintiff and told him that everything was straightened out and that *Mr. LIPNER was mistaken as to where the pipeline easement was.* To verify that the matter was straightened out, the Plaintiff telephoned Mr. LIPNER either on or just prior to March 12, 1971, *and asked if everything was squared away. Mr. LIPNER replied that it was, and that there would be no exceptions in the Title Policy.*" (Emphasis supplied.)

\*    \*    \*    \*    \*    \*

". . . Also, the statement made by Mr. LIPNER either on or just prior to March 12, 1971, when he told Mr. STONE that everything was squared away concerning the pipelines coupled with the fact that Mr. LIPNER then caused to be issued through LAWYERS TITLE AGENCY OF CORPUS CHRISTI INC., an owner's Policy of Title Insurance (attached as "Exhibit A") and a Mortgagee's Title Policy Binder on Interim Construction Loan, neither of which contained any mention of pipeline easements, plus the further fact that Mr. LIPNER approved for transfer of title the Warranty Deed from ISABEL B. WEIL (GOODSTEIN) which also did not mention any pipeline easements, *constituted common law fraud on the part of ELI LIPNER and LAWYERS TITLE AGENCY OF CORPUS CHRISTI, INC.,* in that such statements and acts on the part of ELI LIPNER and LAWYERS TITLE AGENCY OF CORPUS CHRISTI, INC., constituted representations on their part that the title to the land Plaintiff was buying was not burdened with pipelines or pipeline easements. These *representations were made with the intention that they be acted upon by the Plaintiff in the manner reasonably contemplated,* (i. e., he would close the transaction, take title to said property and construct an FHA insured mobile home park thereon). *Plaintiff rightfully relied upon the truth of said representation which were of material facts. These statements and acts were willfully made and done by each of the three Defendants and they knew, or in the exercise of reasonably care they should have known, the falsity of their statements and acts.*" (Emphasis supplied.)

Lipner did not in any manner level any special exceptions to the sufficiency of Stone's pleadings nor to any other aspect of the plaintiff's pleading on which they went to trial. I disagree with the majority holding that Lipner's objection to the admissibility of the evidence of Lipner's statement to Stone that "I found out there are no easements on the property", should have been sustained on the grounds that it was at variance with Stone's pleadings. This is so for several additional reasons.

First, I believe the evidence admitted by the trial court was responsive to the plaintiff's allegations of fraud on the part of Lipner. Second, for the variance complained about to be such as to exclude the evidence admitted at trial and our review of the same, it must have been a fatal variance. Certainly not every variance is fatal. A workable criterion is implicit in the factors recognized in dividing variances be-

tween those which are material and those which are not. A variance is immaterial when so insubstantial that it would not mislead, surprise, or otherwise prejudice the opponent. 2 McDonalds, Texas Civil Practice § 5.19 p. 60 (1970). For a variance between the pleadings and proof to be fatal, the variance must be substantial, misleading and a prejudiced departure. *Orgain v. Butler*, 478 S.W.2d 610 (Tex.Civ. App.—Austin 1972, no writ); *Glens Falls Insurance Company v. Vetrano*, 347 S.W.2d 769 (Tex.Civ.App.—Houston 1961, no writ). Here, there was no showing that Lipner was misled or surprised by the introduction of such evidence or that such evidence was a prejudicial departure from Stone's pleading, particularly in view of the fact that evidence of like effect (which will be set out later) was admitted later into evidence without objection together with the fact that Lipner had the opportunity to avoid being misled or surprised by employing the use of special exception in obtaining further particularities prior to trial. This, he failed to do. There being no fatal variance, the trial court did not err in overruling Lipner's objection and admitting into evidence Stone's testimony of what Lipner told him.

The majority holds that Stone's pleadings are insufficient to support a judgment (even if there is evidence) against Lipner or the Agency for misrepresentation of a material fact which induced Stone to close the transaction. The majority based its decision on the technicality that the statement by Lipner that "everything was squared away", coupled with his acts constituted representations that "the title to the land was not burdened with pipelines or pipeline easements" is not an allegation of fact but a mere conclusion by the pleader and as such cannot be considered. Even if this was true, which it is not, a legal conclusion pleaded is permissible, if the pleader's adversary is not misled by it. *White v. Bond*, 355 S.W.2d 225 (Tex.Civ.App.—Amarillo 1962, rev'd on other grounds, 362 S.W.2d 295 (1962); *Texas Employers' Insurance Association v. Price*, 336 S.W.2d 304 (Tex.Civ. App.—Eastland, 1960, no writ); Rule 45, T.R.C.P. This is particularly true in the absence of special exceptions to the pleading. *Texas Employers' Insurance Association v. Price*, supra; *Greenfeld v. San Jacinto Insurance Company*, 319 S.W.2d 134 (Tex.Civ.App.—Houston 1958, no writ); *Blackstock v. Gribble*, 312 S.W.2d 289 (Tex. Civ.App.—Eastland 1958, writ ref'd n. r. e.). There is certainly not one thing in this record to indicate that Lipner or the Agency was misled by the pleadings of Stone. Neither Lipner nor the Agency contend in their briefs that they were misled.

Next the majority asserts that a special allegation in a pleading controls over a general allegation and it can, therefore, be inferred that the meaning of the term "squared away" is limited by the specific allegation "there will be no exceptions in the Title Policy", to which it was coupled citing *Monsanto Company v. Milam*, 494 S.W.2d 534 (Tex.Sup.1973) and *Richardson v. First National Life Insurance Company*, 419 S.W.2d 836 (Tex.Sup.1967). These cases are not in point. The allegations in Stone's pleading that Lipner replied that everything was *squared away* cannot be considered a general allegation. Unquestionably, it is an allegation of a specific fact (a statement) making up one of the elements of fraud. There is nothing general about such allegation.

The allegation that Lipner made the fraudulent statement i. e. " . . . everything was squared away concerning the pipelines . . . " and the introduction of such same evidence showing the same, together with the context in which said statement was made is some evidence of a material representation and I would hold that it was properly admitted into evidence by the trial court.

Even if it can be held that a fatal variance exists precluding the admissibility of the above evidence (which it cannot), other evidence of like character was later introduced without objection, therefore, implying consent to try issues outside the pleadings. Mr. Stone's testimony, later introduced without objection, is set out as follows:

"Q  And it was correct, he (Lipner) said that everything was squared away?

A  He (Lipner) said that he and Joe Weil had resolved the confusion. That he knew now where the easements were. They were not in the property that I purchased. Words to that effect."

The majority attempts to discard the above evidence asserting that Stone, by adding the phrase "words to that effect", qualified this particular testimony as being no more than his interpretation of the meaning of Lipner's statement to him. This reasoning has no merit.

This Court sets out the applicable law and we should remain conscious of it throughout, this being that in an instructed verdict case, we must indulge every inference that may properly be drawn from the evidence against the action of the trial judge in withdrawing the case from the jury and instructing a verdict in favor of Lipner and his Agency and against Stone. The majority in viewing the above evidence seems to be indulging inferences against Stone instead of against Lipner, which is, under these circumstances improper. Applying the proper rules of appellate review, and after reviewing all of the evidence, I would hold that there is some evidence of probative value that Lipner made a material representation to Stone that was false.

It being established that there was some evidence of a material representation by Lipner to Stone, which was unquestionably false, we next look to see whether there was any evidence that Lipner knew said statements or representations were false when he made them, or whether there is any evidence that he made them recklessly without any knowledge of their truth and as a positive assertion. The majority erroneously holds that there was no evidence that Lipner knowingly made a false statement to Stone, or that Lipner made any representation "recklessly" without any knowledge of its truth and as a positive assertion. Assuming for a moment there was no evidence that Lipner had actual knowledge of the falsity of his statements

to Stone, there was ample evidence that Lipner's representations were made recklessly without any knowledge of their truth and as a positive assertion.

It is the Texas rule that when a party makes a positive representation that a fact is known to him, the same being a material fact about which accurate knowledge could be ascertained, and if such representations are false, it amounts to a positive and active fraud for which he is liable in damages. *Harris v. Shear*, 177 S.W. 136 (Tex.Civ.App. —Austin 1915, no writ) and cases cited therein.

It is generally not essential to support an action in fraud that the one making the false representation knew that it was false at the time it was made. *Jumonville Pipe and Machinery Co. v. Haslam Lumber Co.*, 129 S.W.2d 386 (Tex.Civ.App.—Beaumont 1939, no writ); *Missouri, K & T Ry. Co. of Texas v. Maples*, 162 S.W. 426 (Tex.Civ. App.—Dallas 1914, writ ref'd). If one states material facts as of his own knowledge, by which another is induced to act to his detriment, it is no defense to reply that, although the representations were false, the person making them believe them to be true. *Gibbens v. Bourland*, 145 S.W. 274 (Tex.Civ.App.—San Antonio 1912, no writ); 37 C.J.S. Fraud § 21(a), (b), (c), pp. 255–258; 25 Tex.Jur.2d Fraud and Deceit § 17; 37 Am.Jur.2d Fraud and Deceit §§ 203, 204.

The evidence reflects that on November 12, 1970, the chief examining attorney for the Agency prepared a written title opinion which showed that the easements in question were encumbrances to the title on the subject tract. Lipner states that he never consulted with the examining attorney, nor did he review the title opinion prior to making the questioned statements to Stone on March 12, 1971. The evidence shows that at all times pertinent to this lawsuit, there were certain records in the Agency's office commonly referred to as "take-off" cards which if Lipner had read would have shown the existence of the particular pipeline easements. Lipner stated that he did not look at the cards prior to the time he made the representations to Stone.

One must then question: what basis did Lipner have in making those representations? Lipner testified that he relied upon facts which were given to him by his friend (Weil) and that such reliance (as it now proves out) was a mistake in his judgment. If it was true that Lipner relied upon what Weil had told him and disregarded the title opinion prepared by his chief title examiner and disregarded the take-off cards located and easily available in his office, Lipner did in fact "recklessly represent" a positive fact without knowledge of its truth.

Concerning the issue of recklessness, our Texas Legislature has in enacting Article 9.34 Tex.Ins.Code Ann., set out several requirements which must be met before a policy or contract of title insurance can be written. Article 9.34 provides in pertinent part as follows:

"Determination of Insurability

No policy or contract of title insurance shall be written unless and until the title insurance company (a) has caused a search of title to be made from the title evidence prepared from an abstract plant . . . , and (b) has caused to be made a determination of insurability of title in accordance with sound title underwriting practices . . ."

Surely, the Legislature of Texas in enacting the above legislation did not intend that a president of a title company should rely on what his friends tell him over what he could have determined from his own title opinion or take-off cards which were readily available to him. I believe that such action by Lipner in relying entirely upon Weil and not the title opinion or take-off cards is evidence raising a fact issue as to whether Lipner's statements to Stone were recklessly made without making any inquiry as to their truth.

There is still a further inference of fraud raised by the evidence. The Agency's chief title examiner found the defect in the title and set it out in his title opinion to the title agency. Lipner was the Agency so to speak.[1] Lipner called Stone and told him that "he was confused as to where the pipelines were." This confusion can reasonably be inferred from all of the evidence available to Lipner. If Lipner had actual knowledge of the title examiner's opinion or had seen the "take-off" cards, this knowledge would account for Lipner's confusion. Where else would Lipner have had knowledge that the easements were on the subject property causing him to be confused. His cards and what the title examiner pointed out stated that there were pipelines over the subject property. Lipner's friend (Weil) said there were no pipelines over the subject property. Since Lipner knew (from the above inference) where the pipelines were, but chose to represent to Stone that either: 1) he had no such knowledge, or 2) that he was going to rely on what his friend Weil had told him, the fraudulent representation was perpetrated in either event. It was to Lipner's and the Agency's advantage that the real estate deal close. It was after these facts were available to Lipner that Lipner called Stone and said "It is true that there *was confusion*. I found out that there were no easements on the property. There will be no exceptions made." The actual knowledge by Lipner, or the reckless disregard of the truth by Lipner, coupled by Stone's reliance to his damage, completed the fraud.

The fourth element necessary, for an action in fraud, that the statement was made with the intention that it should be acted upon by the other party is not usually at issue, since it can be inferred from the reckless nature of the statement made. However, there is ample evidence raising such issue. Lipner told Stone that the pipeline easements were not on the property, when Lipner told Stone this, he knew, or a reasonable person would have known, that Stone would rely on those statements. The

---

1. Eli Lipner was president and principal stockholder of the Lawyers Title Agency of Corpus Christi, a Texas Corporation. Wilson was the chief title examiner and an employee of Lawyers Title Agency of Corpus Christi. Lipner had a contract with Lawyers Title Insurance Corporation to undersign the insurance policies for Lawyers Title Insurance Corporation as an exclusive agent for Nueces County.

majority insists that there was no evidence that Stone relied on any statements made by Lipner at the time of closing. This is not so. The evidence clearly shows that after the contract for the sale of property had been signed by all parties, the question was raised concerning the pipeline easements. Stone sought and received assurance from Lipner that there were no easements on the land just prior to the closing of the transaction.

"Q  All right. *Now just prior to the closing of this transaction on March the 12th of 1971,* did you have any conversations with Mr. Lipner or Mr. Weil about pipelines in this 18.639 acres of land?

A  . . . Mr. Lipner called me and asked me if I knew of any pipeline easements on the property that I was purchasing, and my words were to the effect that, *'My Lord, Eli, (Lipner) I don't know of anything out there. That's your job. You're supposed to be the one that's being paid to search the title,'* and he hung up. Shortly thereafter Joe Weil came up to the office and told me that Eli was confused and that he had it all straightened out. That there wasn't any easements there. There wouldn't be any exceptions in the policy. *I called Eli Lipner to confirm that, and he did. That was the reason why I entered into the contract.* . . ." (Emphasis supplied.)

There was other evidence that Stone relied on Lipner just before closing:

"Q  *Now, at the time of closing this particular transaction, did you in any way rely on these statements (by Lipner) that you have just described?*

A  (answer by Stone) I relied on Mr. Lipner and Mr. Weil one hundred percent. If there would have been any doubt, any question in the mind of Charles C. Stone, Jr., that he was purchasing a piece of property that was encumbered with easements, I would not have entered into the contract."

Lipner must have recognized that his statements were likely to induce actions, because they did. Lipner did not attempt to stop Stone from closing the deal several days later.

Generally speaking, whether Stone would have acted in the absence of the representations is the test of whether or not he relied thereon. But here, the evidence is clear that Stone did rely on Lipner. It is not even necessary that there be a statement by Stone as to his reliance where Stone's acts show the same. Either way, Stone relied.

The majority would have us infer that Stone was talking about closing the original contract instead of closing the real estate deal. One only has to read the statement of facts to see that all of the conversations were made after the contract had been executed and that Stone and Lipner were talking about closing the transaction. This is just a play on words.

The evidence shows that within a day or two after Lipner made these representations (the above statement) to Stone, the closing occurred. It is virtually undisputed and only logical, that had Stone known that the easements were on the land in question, the closing would not have taken place. The evidence clearly shows that Stone acted in reliance upon Lipner's statements. The jury should have had a chance to have answered this question! 37 C.J.S. Fraud § 22a, b, § 26.

The last element, that being that Stone suffered damage or injury due to such reliance is sufficiently supported by the evidence. It is undisputed that Stone suffered considerable damage because of the existing easements and pipelines on the subject tract of land, among which were: 1) the park had to be redesigned and he lost the income from such necessary redesign; 2) there was a reduction in the number of spaces which in turn caused a reduction in the F.H.A. commitment; and 3) the de-

crease in value of the 7-acre tract due to the easements thereon.

Honoring the inferences which must be indulged against the instructed verdict, I would hold that the record shows that all the elements of fraud in the action against Lipner and the Agency were raised by both the pleadings and evidence and that a remand of the cause of action against Lipner should be submitted to the jury for their final determination.

Since all three judges agree that there is evidence of fraud in Stone's cause of action against Weil and that such should be reversed and remanded for trial, I believe that Stone's cause of action based on fraud against Lipner and the Agency should also be reversed and remanded for trial for still another additional reason. The evidence is clear and in fact is readily admitted that Eli Lipner and Joe Weil were friends. They enjoyed a close relationship throughout the entire transaction concerning Stone. If Weil is to be re-tried for fraud, the circumstantial evidence is overwhelming that Lipner should be a co-defendant along with Weil in such new trial. Lipner and Weil worked together and they each had the most to gain in inducing Stone to go ahead and buy the encumbered property.

I concur only in the result reached concerning Lawyers Title Insurance Corporation and Joe B. Weil. I would reverse that part of the judgment which decrees that Stone take nothing against Eli Lipner and Lawyers Title Insurance Agency of Corpus Christi, Inc. and remand the same to the trial court for a new trial with Joe B. Weil.